## LOLA THRASHER v. STATE.

No. A-4838. Opinion Filed June 27, 1925.
(237 Pac. 139.)

Joe S. Eaton and Carter & Carter, for plaintiff in error.

The Attorney General and Chas. Hill Johns, Asst. Atty. Gen., for the State.

BESSEY, P. J.   Lola Thrasher, plaintiff in error, for convenience here referred to as the defendant, was by verdict of a jury found guilty of perjury, with her punishment fixed at imprisonment in the penitentiary for a term of five years.   From the judgment on the verdict she appeals.

The charge and conviction of perjury were based upon the alleged falsity of testimony given by the defendant in a habeas corpus proceeding brought by Dan O'Hara for the purpose of being admitted to bail upon a charge of murder then pending against him.   It was shown by testimony on the part of the state, and admitted by the defendant, that in the habeas corpus proceeding Lola Thrasher testified in substance as follows:

"Q. And if the Henryetta Grocery store is in the middle of the block, then you were back about a block away from it?   What time did you and Dan O'Hara get together that evening?   A. Left my house about 7:30.

"Q. Were you together all that time?   A. Yes, sir.

"Q. And do I understand you to tell the court then that you and Dan O'Hara were together from 7:30 until after this shooting took place?   A. Yes, sir.

"Q. Tell the court where you went and where you were.   A. We left the house about 7:30 and went to my sister's, drove around town, got some gas, and Mr. Dan said, 'It is after 9 o'clock, let's go home,' and we came home, come down through town to go home, sat on the

porch awhile, and the baby went on to bed, and he said, 'Is there any ice water?' and I said there wasn't. He said, 'Let's go and get a drink,' and I said, 'All right,' and we got in the car and went to the Frisco Cafe, and got a Coca-Cola and they brought it out to the car to us.

"Q. And you tell the court you were with Dan O'Hara constantly from 7:30 up to 10 o'clock? A. Yes, sir.

"Q. He was not away from your presence? A. No, sir."

At the trial on the perjury charge it was shown by the state, and practically admitted by the defendant, that Dan O'Hara was not in the company and presence of the defendant at all times between the hours of 7:30 and 10 o'clock on the night in question; that the defendant resided in Henryetta, in a house situated on a 35-foot lot, and that her mother resided in a house on a 50-foot lot adjoining; that between 8 and 9 o'clock on the night in question the defendant took her little daughter, six years old, from her own home to the home of defendant's mother, for the purpose of putting her to bed there, and that the defendant, in assisting the child to disrobe and get settled for the night, covered a period of time of from 25 to 40 minutes; and that during that time the defendant was not in the presence and company of Dan O'Hara. It further appears from the record that during this period of time Dan O'Hara went back to the business part of town, where he was seen by different persons, and that according to his own statement he returned to the home of the defendant before she returned from her mother's house. Defendant claimed that she did not know that O'Hara left her home during this interval, as she found him on the porch where she had left him when she went to put the child to bed.

It is contended by the defendant that she did not know the meaning of the word "constantly" when she testified in the habeas corpus proceeding, and that, since Dan O'Hara was at her home when she left to put the little girl to bed,

and was there when she returned, she assumed, and had a right to assume, that he had been there all the time, and could not have been near the place where the homicide occurred during that time, and that she did not know nor realize that she had testified falsely when she said they were together constantly from 7:30 until 10 o'clock.

Defendant stated, and her statement was corroborated by her attorneys, that after she had testified as above quoted she explained to O'Hara's attorneys about the interval of time during which she was at her mother's with the little girl, and inquired whether she ought to go back on the witness stand and make a correction, and that the attorneys advised her that it was unimportant and not necessary.

The testimony of the defendant, in chief and on cross-examination, at the trial of the cause here on appeal indicates that she was a woman of limited mentality. The attorneys found it difficult to make her understand some of the questions propounded, and were compelled to reform the questions and state them in more simple language before she knew how to answer. In this appeal defendant and her attorneys claim that at the habeas corpus hearing she did not know nor comprehend that she testified falsely when she said she was with O'Hara from 7:30 until 10 o'clock p. m.; that, because she left O'Hara on her front porch when she went to put her little girl to bed, and found him still there when she returned some minutes later, she assumed, and had a right to assume, that he remained there during this interval, and therefore could not have been at the scene of the homicide shortly after 9 o'clock; that her good faith in testifying as she did was demonstrated by the fact that, after she realized that her testimony was inaccurate, she made the suggestion that she ought to go back on the stand and explain about putting the baby to sleep at her mother's; that she made this suggestion to the young attorney, Carter, who was assisting his father in

the habeas corpus proceeding, and that the young man called his father's attention to the discrepancy in her testimony, and that the father said, "I don't believe it is important." In this defendant was corroborated by both father and son.

This state of facts, if true, would seem to indicate that the attorneys were more to blame than this defendant, and that she at that time wanted to correct her testimony by supplying omissions inadvertently made, but made in good faith. The fact that the jury in the course of their deliberations twice returned into court for further instructions upon this feature of her testimony indicated that this was considered the decisive issue in the case.

After the jury were brought into court by the bailiff, the court inquired of them what it was they wanted to know. The foreman replied that they wanted to have a transcript of the questions asked the defendant in the previous case and what she said about it in this case. The court ordered the reporter to read her testimony, which was done, and the jury retired for further deliberations. Later they again came into court, and requested instructions on the meaning of the words "constantly" and "continuously." The court defined these words in the language found in Webster's dictionary. The foreman then asked this question: "Is it the law that any one can go back on the stand and rectify their mistakes?" To this the court replied: "Gentlemen, you will have to look to your instructions for that." Since the instructions given did not cover that specific point, we think the jury should have been informed that she had that right, and that, if the jury believed that such were the facts they might be considered in support of her claim of good faith.

This, especially when considered in connection with the fact that her proffered testimony tending to show good faith was denied, or at least impaired to such an extent as

probably to confuse the jury, as is shown by the following excerpt from the record:

"Q. Now, when you testified up there at Okmulgee, on the hearing on the habeas corpus writ, I will ask you if you intended to testify, or give any testimony, or evidence, that was false?

"Mr. Williams: We object, as incompetent, irrelevant, and immaterial, what was the intention of the witness at that time.

"The Court: Sustained.

"Mr. Eaton: We except.

"Q. What was your purpose and intention, if you had any, in giving your testimony in this hearing? Was it for the purpose—

"Mr. Williams (interrupting): Just wait a minute; object to counsel putting the answer in the witness' mouth.

"The Court: Let him finish.

"Q. (continuing): —to corruptly and falsely testify in Dan O'Hara's behalf to that court?

"Mr. Williams: We object to that as incompetent, irrelevant, and immaterial at this time.

"The Court: Sustained.

"Mr. Eaton: We except.

"Q. State whether or not at the time you testified to the evidence here, in which they have now charged you with committing perjury—

"Mr. Williams: To which we object—

"Mr. Carter: Wait.

"Mr. Williams: I thought you were through.

"Q. (continuing). —if you knew you were testifying falsely, or did you think you were testifying to the truth?

"Mr. Williams: To which we object. The witness had no right to think at that time, or this time. It is incompetent, irrelevant, and immaterial at this time.

"The Court: Overruled.

"Mr. Eaton: Read the question. (Question read). A. I thought I was testifying to the truth. I am sure I didn't go up there to testify falsely.

"Mr. Williams: To which we object, and ask that the jury be instructed not to consider the answer.

"The Court: Everything but the answer to the question asked will go out.

"Mr. Eaton: We except to the ruling of the court, wherein he excludes the answer of the witness.

"Q. State to the court and jury whether or not you had any intention of stating anything in that hearing but the truth.

"Mr. Williams: To which we object as incompetent, irrelevant, and immaterial.

"The Court: Sustained.

"Mr. Eaton: We except.

"The Court: That was shown by the preceding question.

"Mr. Eaton: To which ruling of the court we except."

This part of the examination may have confused the jury. The objections to some of the questions were improperly sustained, although it appears that the court permitted one of the answers of the defendant, or a part of it, to go to the jury; on the contrary the exception saved at that point by Mr. Eaton would seem to indicate that the court did not rule in defendant's favor.

This want of clarity, considered with the fact that the jury were for a time in doubt upon the question of whether the defendant made an honest mistake or omission in her testimony, makes it necessary for this court to hold that the defendant did not have a full and fair opportunity to show that she honestly believed that she was testifying truthfully. The repeated sustaining of

the objections to the questions relating to her purpose and intent may have led the jury to believe that her claim of good faith was incompetent and inadmissible.

In the case of Mathes v. State, 15 Okla. Cr. 382, 177 P. 120, it was shown that Mathes, in the trial of another case, testified that he had removed the splints from the arm of an injured person in March, 1914. The time of the removal of the splints was a material issue in that case. At the trial on the perjury charge these questions were asked him:

"Mathes, did you have any intention of swearing falsely in any of the answers to the questions propounded to you in the former trial? Was it your purpose or intention to swear falsely in these matters you have been asked about in the trial of the case with Dr. Gross?"

The trial court refused to permit the witness to answer these questions. On appeal of the case this court said:

"It is an elementary proposition that knowledge of the falsity of the alleged perjured testimony is an essential and indispensable element of the crime of perjury. * * * It follows that the defendant had a right to testify as to his intention of swearing falsely as to the statements made by him as a witness in the case in which the defendant is charged with perjury, such testimony to be considered by the jury in connection with all the other evidence and circumstances in the case, and the court committed reversible error in refusing to permit the defendant to answer said questions as to his intention and purpose in testifying as he did in the trial of the case in which the perjury is alleged." Cassady v. State, 18 Okla. Cr. 568, 197 P. 171; Pilgrim v. State, 3 Okla. Cr. 49, 104 P. 383; Cutler v. Ter., 8 Okla. 101, 56 P. 861.

Without a full opportunity to show honesty of purpose and good faith, it might operate as a grave injustice to send this woman of limited understanding to the penitentiary for a term of five years, and more particularly so since it is shown that her attorneys were probably responsible

103

for her failure to correct her testimony before the hearing closed in the habeas corpus proceeding.

The judgment of the trial court is reversed and the cause remanded.

DOYLE and EDWARDS, JJ., concur.