## W. H. PILGRIM V. STATE.

No. A-110.    Opinion Filed October 9, 1909.

(104 Pac. 383.)

1.  **GRAND JURY—Preservation of Evidence—Necessity.** Section 5333, Wilson's Rev. & Ann. St. 1903, provides: "The grand jury must appoint one of their number as clerk, who must preserve minutes of their proceedings, except of the votes of the individual members, and of the evidence given before them." Held, that this statute does not require that evidence before the grand jury be preserved. At most it means minutes of the evidence, which would be merely a memorandum.

2.  **WITNESSES—Testimony of Grand Jurors—Competency.** Section 5347, Wilson's Rev. & Ann. St. 1903, provides: "A member of the grand jury may, however, be required by any court to disclose the testimony of a witness examined before the grand jury for the purpose of ascertaining whether it is consistent with that given by the witness before the court, or to disclose the testimony given before them by any person, upon a charge against him for perjury in giving his testimony or upon his trial therefor." Held, that this statute affirmatively · establishes the competency of grand jurors as witnesses testifying orally as to the statements of defendant, made as a witness before the grand jury in a prosecution of said witness for perjury.

3.  **PERJURY—Admissibility of Evidence—Address of Judge.** On a prosecution for perjury, consisting of testimony by defendant before a grand jury, which was investigating crimes committed in connection with the unlawful mutilation and alteration of election returns, it was error to admit in evidence, and have read from the record, an address made by the presiding judge at the convening of the first term of the district court of the county; such evidence being irrelevant and calculated to mislead the jury as to the proper grounds and consideration upon which they should found their verdict, and therefore prejudicial to the defendant.

3 Cr.—4

Synopsis of Briefs.

4. **PERJURY—Intent.** Section 2081, Wilson's Rev. & Ann. St. 1903, which declares that: "An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false"—should be construed with section 2074, Wilson's Rev. & Ann. St. 1903, which provides that: "Every person who, having taken an oath that he will testify, declare, depose or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states any material matter which he knows to be false, is guilty of perjury."

5. **SAME.** Perjury consists in swearing willfully and corruptly, contrary to the belief of the witness, not in swearing rashly and inconsiderately according to his belief.

6. **SAME.** Corrupt motive is indispensable to perjury; and one having knowledge respecting the fact, who testified, however positively, only what he believes to be true, can be guilty of no crime, although he was "mistaken."

7. **TRIAL—Direction of Acquittal.** A motion on the part of the defendant to direct a verdict of acquittal should be sustained, where the evidence is insufficient to show the commission of the offense charged.

8. **PERJURY—Sufficiency of Evidence.** See opinion for evidence stated, which is held to be insufficient to sustain a conviction for perjury.

(Syllabus by the Court.)

*Error from District Court, Alfalfa County; Milton C. Garber, Judge.*

W. H. Pilgrim was convicted of perjury, and he brings error. Reversed.

*Guy D. Talbot* and *Cloud & Halstead,* for plaintiff in error.— On necessity of corrupt intent in perjury: *Green v. State,* 41 Ala. 419; *Nelson v. State,* 32 Ark. 192; *Commonwealth v. Dunham,* Thacher Cr. Cas. 519; *State v. Higgins,* 124 Mo. 640; *United States v. Shellmire,* Fed. Cas. No. 16,271; *United States v. Smith,* Fed. Cas. No. 16,341; *Scott v. Cook,* 62 Ky. 314; *Commonwealth v. Brady,* 71 Mass. 78; *Gibson v. State,* 15 S. W. 118.

*Charles West,* Atty. Gen., and *Charles L. Moore,* Asst. Atty. Gen. (*C. H. Parker,* of counsel), for the State. No copy of brief reached the reporter.

DOYLE, JUDGE. At the June, 1908, term of the district court of Alfalfa county the plaintiff in error, W. H. Pilgrim (hereinafter designated as the defendant), was indicted for perjury. Upon this indictment the defendant was tried and convicted at the October term, 1908, of said court.

The indictment, in substance, charges that in the county of Alfalfa and state of Oklahoma, on the 21st day of January, 1908, the defendant, W. H. Pilgrim, appeared before the grand jury of said county as a witness to testify as to certain matters in an inquiry then being held by said grand jury for the purpose of investigating a certain crime, or crimes, which had been committed in the proposed county of Alfalfa, state of Oklahoma, in connection with the unlawful mutilation, alteration, and falsification of certain election returns of the election held on September 17, 1907; that the defendant was by T. R. Couch, the foreman of the grand jury, sworn to testify the truth, the whole truth, and nothing but the truth; that it was and became a question of fact, material to said investigation by said grand jury, to determine the time when the ballot boxes and keys to the locks of election precinct No. 7 of the proposed county of Alfalfa, together with a part of the keys to the locks of the ballot boxes of election precinct No. 5 of said proposed county, which ballot boxes and keys, employed and used by the election boards in said election precincts in said election, were delivered by one J. D. Williams to the office of the county clerk of the proposed county of Alfalfa, at Cherokee; that the defendant did then and there falsely, corruptly, knowingly, willfully, maliciously, feloniously, unlawfully, and contrary to his said oath swear and testify, in substance and effect, that the ballot boxes and keys to the locks of same of election precinct No. 7, together with a part of the keys to the locks of the ballot boxes of election precinct No. 5, were delivered by one J. D. Williams to the office of the county clerk of the proposed county of Alfalfa, at Cherokee, on the 19th day of September, 1907, when in truth and in fact the ballot boxes and keys to the locks of same of election precinct No. 7, together with a part of the keys to the ballot boxes of election precinct No. 5, were not delivered by J. D. Williams

to the office of the county clerk, at Cherokee, on the 19th day of September, 1907, but were so delivered by said J. D. Williams to the office of the county clerk, at Cherokee, on the 18th day of September, 1907; that in all of said particulars the testimony, statements, and declarations so sworn and testified unto by the said W. H. Pilgrim were then and there material matters in and to the said investigation and inquiry by said grand jury, and were then and there not true, but false, as the said W. H. Pilgrim then and there well knew.

The jury returned a verdict of guilty on October 8, 1908. On October 10th defendant filed his motion for a new trial, which motion was on the same day overruled by the court, and exception allowed. On the same day the court pronounced judgment on the verdict, and sentenced the defendant to serve a term of two years' imprisonment in the state penitentiary, and from that judgment and sentence he has appealed to this court.

The case was argued orally before the full bench, and able and elaborate briefs were submitted by counsel for the defendant and for the state. We have carefully read the evidence; and, having reached the conclusion that the judgment in this case cannot be permitted to stand, for this reason we see no occasion for following counsel in their learned discussion of all the various errors assigned. We will therefore only discuss a few of the most important questions presented.

Counsel for the defendant contend: That the testimony of certain grand jurors concerning the proceedings of the grand jury, and the evidence introduced before it, including the administering of the oath to, and the testimony given by, the defendant, was incompetent and inadmissible, for the reason that it was not the best evidence of the proceedings of, and the evidence given before, the grand jury, and that parol proof was not admissible. Section 5333, Wilson's Rev. & Ann. St. 1903, provides:

"The grand jury must appoint one of their number as clerk, who must preserve minutes of their proceedings, except of the votes of the individual members, and of the evidence given before them."

This statute does not require that evidence before the grand jury be preserved. At most it means minutes of the evidence, which would be merely a memorandum. This would authorize oral evidence. Section 5347, Wilson's Rev. & Ann. St. 1903, provides:

"A member of the grand jury may, however, be required by any court to disclose the testimony of a witness examined before the grand jury for the purpose of ascertaining whether it is consistent with that given by the witness before the court, or to disclose the testimony given before them by any person, upon a charge against him for perjury in giving his testimony or upon his trial therefor."

This provision of our statute affirmatively establishes the admissibility of such testimony. By virtue of this provision the evidence of the grand jurors was clearly competent.

It is also contended that the court erred in admitting in evidence, over the objection of the defendant, the remarks of the trial judge, made at the convening of the first term of the district court of Alfalfa county. These remarks were spread upon the record of the court, and are as follows:

"Opening of Court by Hon. M. C. Garber, Presiding Judge.

"Fellow Citizens: We are about to convene the first session of the district court of Alfalfa county. The event marks a new epoch in its history. It constitutes a new milestone in the development of a new commonwealth, and I trust that those who are charged with the responsibilities of the occasion will so write with clean hands and honest motives that our successors, the future citizens of this county, may not be compelled to look back with shame to this period, but may be able to look back with some degree of pride, and say that those who were charged with the responsibility were actuated by the commendable motive of the enforcement of the law for the better protection of the home and the fireside, and for the promotion of justice and equity, and that a forum was organized in this humble building in which every man stood upon equal footing, and in which there was no respecter of persons. If this can be said of those who follow, we shall then have contributed our part towards doing the day's work, which is a part of the responsibility of each citizen. When I refer to those upon whom this responsibility rests, I include, first, the members of the bar who are members of the court, with whose assistance only can the

enforcement of the law be secured; and, secondly, I include all citizens called upon to act as jurors who alone are the judges of the fact in a case and upon whom rests the responsibility, in a large measure, of determining the majority of legal controversies that will arise. It is the jurors, acting in a representative capacity, guided by the law and carefully and impartially weighing the testimony in order to arrive at a correct determination of the facts in a case; and thirdly, I refer to the citizens of the county—to the man behind the plow and the counter and in the editorial room— who are charged with the responsibility. of contributing their part to the molding of a courageous public opinion, without which the decree of the court is a dead letter. And so, finally, it drifts back to the responsibility of the individual citizen for the enforcement of the law.

"We organize this court to-day to contribute the legal expression and judgment of this public opinion for the protection of the individual rights of the citizen. I trust that it will be an institution that will contribute its part, and with the assistance of the members of the bar and the good citizens of the county it will be done. With the assistance of the bar and jurors, and the lawabiding, orderly citizenship of the county, I am satisfied that this court will contribute its part in the satisfactory adjustment of all legal controversies, the protection of legal rights, enforcement of law, and the maintenance of public peace and happiness. As public servants, charged with the responsibility of the expenditure of public funds for the maintenance of this institution, we must have due regard for the interests of the taxpayers, as well as the rights of the litigants. The occasion affords a timely opportunity for the members of the bar and citizens present to give some expression of their opinion, and to whom the court now extends a cordial invitation to do so."

The prosecution for the ostensible purpose of showing the opening of the Alfalfa county district court, as the January term, 1908, offered, and was permitted to read in evidence from the court journal, this address. It is insisted by counsel for defendant that this record could have been offered only for the improper purpose of prejudicing the rights of the defendant, and that these remarks of the trial court were calculated to make an ·impression unfavorable to the defendant upon the minds of the jury. The question presented is singular, to say the least. However, we can

conceive of no purpose for which this part of the court record was admissible evidence. What the presiding judge said in his address to the spectators who had assembled to witness the opening of the first term of the district court of Alfalfa county was irrelevant, and could have no legitimate bearing upon any issue in the case. While we have the greatest respect for the judgment of the able and impartial trial judge, we are constrained to believe that this evidence was inadmissible, and clearly prejudicial to the substantial rights of the defendant. The trial judge being the author of this address, it was well calculated to mislead the jury as to the proper grounds and consideration upon which they should found their verdict, and it is impossible to tell to what extent the defendant's rights may have been prejudiced thereby. The defendant, a former official of the county, was on trial charged with perjury in connection with the grand jury's investigation of election frauds. To read to the jury these views of the trial judge as to the duties of jurors in assisting the court in the enforcement of the laws and the protection of society could not be otherwise than prejudicial. When we consider that the verdict is not supported by sufficient evidence, the correctness of this conclusion is confirmed. Jurors are easily influenced by the remarks of a trial judge, and the greatest care should be observed that nothing is said that can by any possibility be construed as an expression of the trial judge's views respecting the merits of a criminal case. Courts cannot be too circumspect in this regard.

Under the next assignment it is contended that the evidence offered was insufficient to make out or establish the crime of perjury. This assignment is based upon the elementary proposition that knowledge of the falsity of the alleged perjured testimony is an essential and indispensable element of the crime of perjury. The state introduced evidence in substance as follows: That the grand jury at the January, 1908, term of the district court of Alfalfa county made an investigation of the alleged alteration and mutilation of certain pollbooks and tally sheets used in certain voting precincts in said county, in the general election held on

September 17, 1907; and that on January 21st the defendant, W. H. Pilgrim, who was deputy county clerk of said county when the election was held, was called before the grand jury and examined as a witness; that he testified that the returns from all of the precincts in Alfalfa county, except Round Grove and Ingersoll (number 7) were delivered to the county clerk's office on September 18th; that Ingersoll and Round Grove were not delivered until the 19th; that J. D. Williams, the inspector who delivered the returns from Ingersoll, also delivered with them a part of the keys to the ballot boxes used in Beard precinct (number 5), which keys would unlock nearly all of the ballot boxes used in Alfalfa county in that election; that on January 22d the defendant voluntarily appeared before the grand jury, and again stated that the returns from Ingersoll, together with a part of the keys from Beard precinct, were not delivered until September 19th; that on January 23d the defendant was again called before the grand jury, was cautioned that he was still under oath, and was asked if there was a receipt out showing that he had receipted for the Ingersoll returns on the 18th—what he would say as to that—and that the defendant answered that he would say the date in the receipt was a clerical error.

B. F. Blue, a member of the grand jury, testified, and on cross-examination was asked, when the defendant was before the grand jury on January 23d, and asked if there was a receipt given by him showing that the returns from Ingersoll were delivered on the 18th, what he would say to that, and answered that he would say that it was a clerical error, if defendant did not qualify his answer by saying that, unless the duplicate on file in the county clerk's office also showed the date of the 18th, he would say that it was a mistake, and that if the receipts both showed the 18th, he would rather trust them than his memory—witness Blue answered that he did not recall that the defendant was asked that question and made that answer, but that he (the witness) was hard of hearing, and that the defendant might have been asked that question and made the answer, and he (the witness) would not have heard it.

T. R. Couch, foreman of the grand jury, testified in part as follows:

"Q. Tell the jury what he testified to; and, if it is necessary to intelligently recite what he testified to, state in substance the questions that were asked of him. A. Well, it was like this: It seems that the returns from the election had all been made to Mr. Pilgrim; that he had been here and received the returns, and they came in all together, and that being the case, why we were considering where the crime had been committed—whether it was here, or whether it was before it got here, or after it had been turned over, or when it was, and we subpœnaed him before us for that reason, to find out, and we were questioning him in this— in these particular places here—and when the returns were made, how they were made, who made them, etc., and he gave us the time the returns were brought in from this township, and that one, and so on, and after awhile we come to find out that this township, No. 5 over here, that the returns and keys were not all delivered at the 'same time. Then we were inquiring into that, and said that there was half of the keys taken to Ingersoll and turned over there to Mr. Williams, and he brought them down, and that the ballot boxes and pollbooks from Beard township, or No. 5 rather, were brought in, I think the first that arrived. Anyhow, they were here early the next morning after the election, something like sunup, and that the keys and that the other half of the keys that was not delivered with the returns, they came in— the half that went round by Ingersoll, they were not delivered until the evening of the 19th. Q. Who testified to that? A. Mr. Pilgrim testified to that. Q. In that testimony that he gave on the 21st day of January, 1908, before the grand jury, did he testify in regard to the time when the ballot boxes and keys to the locks of the ballot boxes of Ingersoll precinct, being precinct No. 7, and also as to the time when a part of the keys to the locks of the ballot boxes of precinct No. 5, being Beard township, were returned to him? A. Yes, sir. Q. State what he said in regard to the return of these items, as to when they were returned to him. A. He said they were returned to him in the evening of the 19th, or the second day after the election was held, and that this part of the keys that came around from Beard township, around through Ingersoll, was out just about 36 hours from the time the Beard township returns were delivered to him, until the keys were turned over to him, and also stated that those keys that were up there unlocked almost all of the boxes but a few. I don't remem-

ber; five or nine, or something like that.   Q. Did he state who returned the ballot boxes and keys to No. 7, and who returned part of the keys to the ballot boxes of precinct No. 5?   A. You mean the keys that went around?   Q. Yes, sir.   A. Why, Jeff Williams."

On cross-examination the witness, T. R. Couch, was asked if anything was said by the defendant before the grand jury about the receipts that had been issued for the Ingersoll boxes, or that were found in the county clerk's office, and answered that when the defendant was before the grand jury on January 21st, Mr. Blue asked him if he gave Mr. Williams a receipt for the keys; that defendant talked about a receipt, and witness thought it was that evening the defendant said he made a notation on the receipt in regard to the keys.   He was also asked if he heard anything about the receipt that is on file in the clerk's office, when the defendant was before the grand jury.   Witness thought defendant mentioned that he made a notation on that receipt, too, about the keys and their return, on which he made a notation when they were returned.   The witness further testified on cross-examination that the grand jury had before it, and examined, the receipt given to Williams, and also the receipt in the county clerk's office.

J. D. Williams testified that he was inspector of election at Ingersoll precinct on September 17, 1907; that he brought the returns from that precinct, and delivered them to the defendant at the county clerk's office on September 18th; that at the same time he brought and delivered to the defendant a set of keys, said to belong to Beard precinct, which had been handed to him at Ingersoll during the forenoon of September 18th by M. L. Guffy. In his testimony the witness Williams also identified the receipt given to him by the defendant, which receipt was admitted in evidence over the objection and exception of the defendant.

Ab Hunt testified that he came from Ingersoll to Cherokee with J. D. Williams on September 18th, and was with him when he returned the election returns from Ingersoll, and part of the keys from Beard, to the defendant at the clerk's office on that date.

M. L. Guffy testified in behalf of the state that he was one of the election judges at Beard precinct; that when the count of the

votes and the records were finished in Beard precinct, he at once left the polling place and went to Ingersoll on the morning of the 18th; that he forgot to leave with the election board in Beard township one set of the keys to the boxes there which were in his possession; that when he reached Ingersoll he gave the keys to Jeff Williams, and asked him to deliver them to the county clerk.

· The defendant moved the court to direct a verdict on the ground that the evidence introduced by the state failed to show the commission of any offense by the defendant, which motion was by the court overruled and exception allowed.

W. H. Pilgrim, the defendant, testified on his own behalf, in substance, as follows: That he was before the grand jury in question three times; that he was first called before them on January 21st, and questioned with reference to receiving the election returns; that the grand jury had him draw a plat of the building in which they were kept, showing how the doors and windows were locked, and all about the building; that they asked him if it would have been possible for anybody to have gotten into the building where the ballot boxes were kept, or into the place where he kept the keys; that he did not remember of anything being asked him the first time he was before the grand jury about the time he received the returns of any particular precinct, and did not think such questions were asked him on that occasion; that he voluntarily went before the grand jury on January 22d, and stated that half of the keys from Beard precinct and the returns from Ingersoll were not delivered to him until September 19th, and that he asked the grand jury to investigate why they were kept out so long; that he was recalled on January 23d, and testified as follows:

"Q. What questions were asked you at that time? A. They asked me if I was positive about the Ingersoll returns coming in on the 19th. Q. What answer did you make to that? A. I told them that was my recollection, but for fear that I might be mistaken, I asked them to get the receipts that were on file in the clerk's office, and also the receipt I had given Jeff Williams, and examine them. I told them I would rather trust the dates of the receipts than the dates of it in my memory. Q. You told them

you would trust the receipts, did you say? A. Yes, sir; I did. Q. Rather than your memory? A. Yes, sir. Q. Were you asked with reference to these receipts as to what your opinion would be if the receipts showed they came in on the 18th? A. Yes, sir. Q. What statement did you make concerning the receipt given by you to Mr. Williams, based on the assumption that that receipt showed that the boxes were returned on the 18th? A. Well, the question was put something like this, as I remember it: Mr. Blue says, he asked me this question: 'If the receipts that you gave Jeff Williams should show date of the 18th, what would you think about it?' That is about the language, I believe. I says 'I would think it was a mistake, unless the other receipt that is in the clerk's office also showed the same date,' but I was willing for a receipt to be produced, and I would rather trust that than my memory."

The defendant further testified that he was deputy county clerk when the election was held in 1907, and as such had charge of sending out the election supplies to the various precincts, and receipting for the returns as they came in; that the returns began to come in the morning of September 18th, and that the last of them came in on the 20th; that there were 18 precincts, and three boxes for each precinct; that as the returns were brought in from each precinct, he made notation on each receipt that had been signed by the election inspector for the supplies for the various precincts when they were taken out before the election, which notation was made by him on the bottom of each receipt showing just what was returned; that it was this notation to which he referred as a "duplicate receipt" in his testimony before the grand jury, when he told them that if the receipt given to Williams showed the Ingersoll boxes were returned on the 18th, he would say that that was a mistake, unless the receipt in the clerk's office also showed the date of the 18th; that when he testified before the grand jury that the boxes from Ingersoll precinct were returned to the office of the county clerk on September 19th, he stated his honest recollection and belief; that at the time he testified before the grand jury he was not in possession of any fact that led him to doubt or question the truthfulness of his statement.

Numerous character witnesses testified that they knew the defendant's reputation for honesty and integrity, and that his

reputation was good, which was not controverted by the state. We have carefully considered the evidence, and we are of opinion that it is insufficient to show the commission of the offense charged. For this reason the motion to direct a verdict of acquittal should have been sustained. The prosecution is for one of the highest crimes known to the law. The law presumes the defendant innocent until his guilt is established by competent evidence beyond a reasonable doubt. To constitute perjury the statement made must not only be false, but the party making it must know it to be so. If the witness testified under an honest mistake or misapprehension, and believed what he testified to be true, a conviction cannot be had, though the statement be false. *Butler v. State*, 36 Tex. Cr. R. 444, 37 S. W. 746; *Cutler v. Territory*, 8 Okla. 101, 56 Pac. 861.

Section 2081, Wilson's Rev. & Ann. St. 1903, provides:

"An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false."

In *Cutler v. Territory, supra*, Chief Justice Burford, construing this provision, said:

"This section is not intended to define the crime of perjury, but must be read in connection with section 2074, which defines the crime, and, when so read, is intended to include cases where a witness willfully testifies to the truth of matters which he does not know to be true; that the statement must be willfully made is as essential to the crime of perjury in the case of an unqualified statement of that which the witness does not know to be true as in the case of a statement which he knows to be false. There can be no crime of perjury where the witness is honestly mistaken in his testimony, or the oath is according to the belief and conviction of the witness that it is true. The California Criminal Codes contain these same provisions in reference to the crime of perjury, and the same question was before the Supreme Court of that state in the case of *People v. Von Tiedeman*, 120 Cal. 128, 52 Pac. 155; and the court held that there could be no perjury in making an unqualified statement of that which one does not know to be true, unless the element of willfulness entered into the act. We think that court correctly interpreted these statutes, and we have followed their construction."

It is declared an elementary principle in Wharton's Criminal Law, § 1245:

"The offense consists in swearing falsely and corruptly without probable cause or belief, not in swearing rashly or inconsiderately according to belief. The false oath, if taken from inadvertence or mistake, cannot amount to the voluntary and corrupt perjury."

Again, in section 1250 it is said:

"But, if there be no evil intent, general or special, perjury fails. Thus it is not perjury to swear honestly to testimony which the witness believes to be true, though a little diligence would have enabled him to have discovered its falsity."

In Bishop's New Criminal Law, § 1048, it is said:

"Perjury cannot be willful where the oath is according to the belief and conviction of the witness as to its truth. Reckless disregard of truth by a witness, who has no belief that he is swearing falsely, is not perjury, though his testimony is in fact false, and he would have made it true if he had used caution."

See, also, *Green v. State,* 41 Ala. 419; *Nelson v. State,* 32 Ark. 192; *State v. Higgins,* 124 Mo. 640, 28 S. W. 178; *United States v. Smith,* Fed. Cas. No. 16,341; *United States v. Shellmire,* Fed. Cas. No. 16,271; *Commonwealth v. Brady,* 71 Mass. 78; *Gibson v. State* (Tex. App.) 15 S. W. 118—all of which hold in substance that one can be convicted of perjury only where the false testimony was given corruptly, with knowledge of its falsity, and that it is not enough that the defendant in a perjury prosecution testified positively to that which he did not know to be true.

It appears from the evidence that the defendant, as deputy county clerk of Alfalfa county at the time of the election in question, was charged with the duty of receiving and receipting for all the returns from the various election precincts in said county; that there are 18 precincts, and that the returns all came in on two days. From this it is obvious that it would have been strange indeed if the defendant had been able to recollect with certainty the precise time at which any particular portion of the returns reached his office, and that nothing was more probable than that he should have been mistaken as to the time when the

returns from some particular precinct came into his possession. Upon receiving said election returns, receipts were issued to the inspectors or persons returning the same, and a duplicate was filed in the office of the county clerk. In the investigation had by the grand jury the original and best evidence of the facts as to when the ballot boxes and keys were returned was the original and duplicate receipt so issued and filed by the defendant in his capacity as deputy county clerk. The evidence discloses that these receipts were in the possession of the grand jury, but were not submitted to the defendant while testifying as a witness. The evidence does not inform us for what purpose the receipts were withheld. Defendant was entitled, as a matter of fairness, if not of right, to examine the receipts that he had issued, and the duplicates on file in the office of the county clerk. Wilson's Rev. & Ann. St. 1903, § 5339, provides:

"The grand jury may not receive hearsay or secondary evidence."

With the original and duplicate receipts in evidence before the grand jury, we fail to see how the evidence of defendant could be material in any respect without giving him the opportunity to examine said receipts, and that he then should deny their correctness. The dates as shown by the receipts could not be established by statements of the defendant as a mere matter of his opinion and belief. Under these circumstances, rendering it very probable that the defendant might have been mistaken as to dates, and very improbable that he should have remembered all of this correctly, there is nothing in the evidence, either direct or by inference, that tends to show that the defendant had any knowledge that the testimony he gave before the grand jury was false. For the reasons hereinbefore stated we are of opinion that the evidence is insufficient to establish an evil intent, or that the testimony was given willfully and corruptly, and that the evidence as shown by the record is wholly insufficient to support a conviction for the crime of perjury. Our conclusion is fortified by the fact that defendant is a man of good repute, as shown by the record.

The judgment is therefore reversed, and the cause remanded, with direction to the court below to dismiss the prosecution.

FURMAN, PRESIDING JUDGE, and OWEN, JUDGE, concur.