## WAYNE SCOTT v. STATE.

No. A-9441. July 14, 1939.
(92 P. 2d 847.)

442

R. D. Miller, of Hollis, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. Wayne Scott was by information charged in the district court of Harmon county with the crime of perjury, was convicted, and sentenced to serve a term of three years in the State Reformatory at Granite, from which judgment and sentence the defendant Wayne Scott has appealed.

In substance, the record discloses that Wayne Scott, the defendant, was a young man, and was a witness in the case of State of Oklahoma v. Herman Rhodes, No. 493, in the district court of said county, wherein the said Herman Rhodes was charged with rape in the second degree.

The female upon whom it was alleged the rape was committed by Herman Rhodes was Opal Castleman.

Wayne Scott testified in the Herman Rhodes case, and stated that prior to the date of the alleged rape of Opal Castleman, giving the date, he had sexual intercourse with her.

The record further shows that Herman Rhodes was acquitted on the charge of rape, and was later on acquitted on a charge of perjury, growing out of the trial in the rape case.

Opal Castleman, testifying on behalf of the state, in substance stated:

"I live in Harmon county, Oklahoma; have lived there all my life. I am 18 years of age. I was the prosecutrix, and a witness in the case against Herman Rhodes for statutory rape committed on myself. That case was tried on December 7, 1936. I was present when the evidence for the defendant was introduced, and I heard the testimony of Wayne Scott. By Mr. Madden: Q. You heard his statement that he had intercourse with you, wherein he stated that he had intercourse with you at the Slab? A. Yes. Q. You may state to the jury whether that was true or not. A. It was not true."

Opal Castleman continued:

"I did not have intercourse with him at the Slab at all. We were attending an Arnett School party. I do not remember the class, but it was one of the high school classes. Roughly guessing, there were at least a hundred people attending this party. Wayne Scott, myself, and others went to the party in the same car. With us in the party were Jo Tyler, Joe Courtney, Gladys Scott, Wayne Scott, and myself. Joe Courtney is a boy, and Jo Tyler is a girl. Gladys Scott is Wayne Scott's sister. When we got to the grounds, we went to the Slab. When we got to the Slab, I saw Orene Caswell, one of my girl friends, who is a married woman now. Her name at that time was Orene Orr. She is a sister of my sister's husband. I have known her about all of my life. Some of the teachers attended this party. Mildred Scott was the only one that I knew. I was at home some-

time in the latter part of the year, November or October, when Wayne Scott came to my house with three girls, Ruby Tyson, Bernice Wilkerson, and Laverta Wilkerson."

"The purpose of their coming to my house, Wayne came to marry me; but he said he had not had intercourse with me in his life, but he would marry me and stop the trouble. Homer Alexander asked him why he had done that. My mother, sister, and brother, and Homer Alexander were present. Homer Alexander is my brother-in-law. Homer Alexander asked Wayne why he came there, and Wayne answered there were two big shots that came there and told him that if he did not come over and offer to marry me, they would send him to the penitentiary. He didn't name the big shots. I told him at the time I knew he did not have intercourse with me."

On cross-examination the witness stated that she had a baby born the 31st of October, 1936.

"I have the baby here. The baby has blue eyes. By Mr. Miller: Q. Opal, you have changed your story several times, haven't you, about when this offense occurred, haven't you? A. I don't reckon I have. Q. In the first preliminary information you filed before Mr. Kerr, didn't you allege that the rape occurred on the first day of February, 1936?"

An objection was interposed to the question by the state, and overruled.

Opal Castleman, continuing, stated:

"I don't know whether or not I went to the county attorney's office on the 21st day of October last year, and filed a preliminary information, and stated in that information that I was raped on the first day of February, 1936."

The defense offered to introduce the preliminary hearing record, which was objected to by the state, and the objection sustained.

"By Mr. Miller: Q. You did come back a few days later, on the 24th of October, three days after the 21st, and file in this court an amended information, didn't you, Opal? A. I guess I did. Q. And when you filed the amended information you changed the date from the first day of Febru-

ary, 1936, to the 11th day of February, 1935, or more than a year before that? Is that right?"

An objection was interposed by the state, and overruled. The witness answered, "Yes."

"Q. You didn't report your condition to your mother, to your folks, Opal, until just before the child was born? A. No, sir. Q. It was not your intention to report being pregnant—report the outrage you complain of, unless you became pregnant, is that right? A. I guess I would have, sometime. Q. You testified here in this preliminary hearing, didn't you? A. Yes. Q. At the preliminary hearing I asked you this question, 'If you never had become pregnant, you would never have told any one, or prosecuted any one. Was that your intention?' And you answered, 'Yes, sir.' You gave that information? That's right? A. Yes, sir. Q. You testified that this alleged offense that occurred with Mr. Rhodes, you were on a trip home from Arnett and Hollis, didn't you? A. Ask the question again."

The reporter read the question to the witness, and the witness answered, "Yes, sir."

"Q. You testified there were other girls in the car with you on that trip home, wasn't that your testimony? A. Yes, sir. Q. You told also how you were dressed for the game that night, didn't you? A. Yes, sir. Q. What did you say is the kind of a dress you wore? A. Print dress. Q. Do you remember me asking this question on preliminary, 'Now on that first trip home, how many girls were there in the car when you went home from Arnett?' And you answered, 'Winona Kizer, Ruby Tyson, Bernice Wilkerson, Laverta Wilkerson.' Did you give that answer? A. Yes, sir. Q. I will ask you if you remember this question, 'Did you first tell your folks it was on or about the first day of February, 1936?' A. Yes, sir, I think so. I guess if it is in there, I said it. Q. Do you remember along in the spring of 1936 before school was out being up there in the schoolhouse in the book room with Wayne Scott? A. No, sir, I was not up there with him. Q. Do you remember about the first day of February, 1936, Mr. Rhodes entertained down there at the schoolhouse for the team, some of the parents were there, and you and Wayne Scott were there together that night? A. No, we were not. Q. Were you there? A. Yes, sir. Q. Was Wayne Scott there that night? A. I don't

know whether he was or not. Q. Isn't it a fact that you and Wayne Scott cut the crowd there that night and went out in the garage in the dark away from where the kids were playing, and stayed out there for an hour or so in the dark? A. No, I didn't. Q. You were not with Wayne there that night, is that right? A. Yes, sir. Q. Do you remember along in January, 1936, being over at Lloyd Ratliff's to a charivari, and being in a car with Wayne Scott when Arzie Gamble and Ruby Tyson were in the car?"

This was objected to by the state, and the objection overruled.

"A. I was there, but I wasn't with Wayne. Q. You weren't in the car with Wayne, is that right? A. No, I wasn't Q. You never had any intercourse with Wayne Scott, at all? A. No. Q. Is that right? A. No, sir. Yes, sir, that's right. Q. You did have a child, didn't you? A. Yes, sir. Q. That child, you say, was born on the 31st day of October. A. Yes, sir. Q. About eleven months from the first day of February, the time the party was held down there at the schoolhouse, wasn't it? The 31st of October? I mean nine months from the first of February to the 31st of October? Is that right? A. Yes, sir."

The baby of the witness, Opal Castleman, was brought into court, and the following questions asked:

"Q. What color of eyes does the baby have? A. Blue. Q. What color of hair does the child have? A. Well, I don't know. Q. Sandy hair, isn't it? By Mr. Madden: The jury can see for itself."

The state called Mrs. Orene Caswell, who stated that she lived north of Hollis, Okla. Prior to her marriage she was Orene Orr. The witness further stated:

"I was there at the Slab, and saw Opal Castleman there that night. I also saw Wayne Scott. I was with Durard Parker. I was with Opal all the time she was at the Slab entertainment. Wayne Scott was not with her all the time. She did not leave my presence while the entertainment was going on. I got there about 6:30 and left about 11:00. For entertainment we played games, and then we served lunch. Wayne Scott did not have an opportunity to commit an act of immoral relations with Opal Castleman at

that time. There was no attempt to do anything of that kind while I was present."

On cross-examination the witness stated that she was related to Varner Orr.

"I don't know why it is, that they did not have me down here to testify at the Rhodes trial. My brother talked to me about the case. I got my subpoena to come to court this morning. I have known what I am stating all the time; but they just now called on me. The family knew all the time what I knew. I talked to my brother yesterday."

The witness admitted that she had not been called as a witness in the trial of the Rhodes case, and that this was the first time that she had ever been called as a witness. She stated that she sat right with Opal Castleman through the entertainment of playing games, and all, and when the lunch was served, and that Opal could not have been away.

A number of other witnesses, relatives of Opal Castleman and intimate friends, testified that they were present when Wayne Scott was asked the question as to whether or not he had had intercourse with Opal Castleman. They claim that he stated that he had not.

The record shows that Wayne Scott accompanied by several young ladies went to the home of Opal Castleman after he had learned that she was pregnant, and proposed marrying her; that the parents and Opal did not consent to the marriage; but while they were there at the home of Opal, the brother-in-law and family of Opal invited Wayne Scott from the room where his friends were into another room where there were only present the relatives of Opal. Several testified that Wayne told them that he had not had sexual intercourse with Opal.

The foregoing is in substance all the testimony, except that the testimony on behalf of the state shows that every time Wayne Scott was under oath, testifying in any of the trials where Herman Rhodes was on trial and in this case,

he stated positively that prior to the time of the alleged rape by Herman Rhodes of Opal Castleman, that at the Slab he had had intercourse with her.

Bernice Wilkerson, testifying for the defendant, stated:

"I live out in the O. M. Community. During the school period I was on the ball team in 1936. Opal Castleman, also, was on the team. I remember the Rhodes entertaining down at the teacherage for the school and parents of the community. I saw Opal Castleman there that night. And, also, Wayne Scott."

The objection to the question as to whether or not the witness saw Opal Castleman and Wayne Scott leave the room that night was sustained, and the defendant made the following statement:

"Comes now the defense and offers to show by the witness on the stand that she was present at a school party the first day of February, 1936, and that Opal Castleman, the prosecuting witness, and Wayne Scott were at the school party. By The Court: Perhaps you had better not make that statement to the jury. By Mr. Miller: I sure want to make a record. By the Court: You have a right to make your record. By Mr. Pullen: We would like to have the jury withdrawn."

Mr. Miller then renewed his offer to show that at that school meeting Opal Castleman and Wayne Scott left the party, and went into the garage, which was dark and unlighted, and stayed alone with the said Wayne Scott for a period of some two hours, and approximately nine months from the said date a child was born to the said Opal Castleman.

The state objected, and the objection was sustained. Defendant excepted.

"By Mr. Miller: I would like to say the same testimony would be offered by Ruth Henry. By the Court: I sustain that on the ground you can't cross-examine a witness on an immaterial point and use it as a basis for impeaching the witness. If it were in 1934, you can, or prior to 1935."

Gladys Scott stated:

"I am the sister of Wayne Scott. I was one of the party that went to the Slab in September, 1934. I went with Wayne Scott, Jo and Elsie Tyler, Joe Courtney, and Varnie McDaniel. Orene Orr was not one of our party that night. At the party some skated, and some played games, just had a good time generally. Wayne and Opal were both there. They were at the party a little while, and then I did not see them any more. They disappeared. I noticed they were gone. They went back to the car."

On cross-examination:

"I saw them leave the party when they went out, and go to the car. The car was about 50 yards from the school building. I do not know how many feet that would be. It was a general school party. They were playing Drop the Handkerchief, Ring Around the Rosy, and skating. I don't know how many of the teachers were there. The party broke up about 11:30 or 12:00. There were seven of us in the car. I saw my brother and Opal leave the party and go to the car."

Wayne Scott, the defendant, testifying in his own behalf, stated:

"I live up in the O. M. Community, Harmon county. My father is J. C. Scott. He is a farmer in that community. I help work on the farm and go to school. I have lived in that community almost all of my life. I know Opal Castleman. I have known her practically all of my life. We used to go to the same school, but do not now. I have had dates with Opal, and have been out with her quite frequently at different places. I went out to the Slab in the fall of 1934 with Opal. I was subpoenaed down here last fall as a witness for the state in the preliminary hearing for Herman Rhodes, and was used by the state as a witness. The state asked me if I had had intercourse with Opal Castleman, and I told him that I had. I stated that the first time I had intercourse with her was at the Slab in September, 1934. No one asked me to give such an answer. They asked me for the truth and that is what I gave them."

The witness was asked if he had had intercourse with Opal Castleman since that time and he answered, "Yes, sir."

An objection was made on the ground that it was incompetent, irrelevant, and immaterial, unless the time was fixed prior to February 11th, 1935.

The objection was sustained by the court, and the jury admonished not to consider the answer.

Wayne Scott continued:

"In the year 1936, I learned Opal was pregnant. I left in July, 1936, and went to California. I was gone two months. I came back from California before the information was filed against Herman Rhodes on October 21st, 1936. I had been back a short while before the information was filed. I went down to the Castleman's home with some young ladies in the community to talk to the Castlemans about Opal. Ruby Tyson, Laverta Wilkerson, and Bernice Wilkerson went with me. My purpose in going down there was to tell them that I thought I was guilty, and that I had come back to take the responsibility and that I was willing to marry Opal and settle this thing, if they were willing. They said they were not willing; they had the guilty person now. They did not consent to me marrying Opal. When I made that statement, they asked me to come into another room, away from the parties who had come down there with me. In talking privately with me, they said they had got into this trouble, and they were going through with it, and that they did not want me mixed up in it, and if I would leave and not be connected with it in any way, it would be better. I told them that I wanted to do the right thing. Opal and I went to the Slab in the same car as Jo and Elsie Tyler, Joe Courtney, and Varnie McDaniel, and my sister Gladys. I don't know just how many were out at the Slab that night, but there were between twenty-five and thirty-five. It was a class party of the school. I took Opal along as my guest that night. We all got out of the car and went up to the Slab. But we didn't stay long. Opal and I went back out to the car. Some of them were skating, and some were playing games of different kinds, and some of them were preparing the lunch we were to eat later in the evening. They were scattered everywhere. Opal and I went out to the car. We were out there practically the rest of the party. I had intercourse with Opal while we were out there."

On cross-examination the defendant stated:

"I never talked to the county attorney prior to the time I was subpoenaed at the preliminary hearing of the Rhodes case. He didn't know what my testimony would amount to. I had never talked to him. The first time that any one ever knew that I had had intercourse with Opal was when I took the witness stand in the Rhodes case. When I left the party Opal went with me to the car. I heard my sister's statement that the car was about 50 yards from the Slab. That is something like the distance, I don't know. We were driving a tudor Model A. Ford. We raised up the seat and got in the back. Yes, sir, in that car at the Slab which was about 50 yards away, I had sexual intercourse with Opal Castleman. If any one came around the car, I didn't know it. I don't know just what time we went to the car, but it was probably an hour or so after we got to the Slab. We stayed practically all of the time until the party broke up. The party broke up sometime between 11:00 and 12:00. I didn't have a watch. I met Mr. Orr and Mr. Alexander up at the bank, and had a conversation with them. They did not ask me on that occasion if I had had sexual intercourse with Opal. They told me they did not want me mixed up in this trouble, no way, and told me to stay out of it; and that I was a good boy and all that, and they went on, and Varnie said he had the guilty person, and didn't want nobody else. I never said anything and never made any statement whatever. I went out to the Castleman home, and talked with the family. I talked with Opal, to Mrs. Castleman, Opal's mother; talked to her brother-in-law, her sister, and her uncle. I told them before we left that room that I had come over to marry Opal, and stop all this trouble. I was ready to settle all the controversy, and came back from California on purpose to do that. I didn't tell them in substance or in words that I had never had sexual intercourse with Opal, but that I would marry her in order to settle the trouble and protect Rhodes. I told them I felt that I was the guilty party, and I wanted to take the consequences, and would marry her, and stop all the trouble. They said, 'We think we have the guilty person, and that's all we want. We don't want to cause anybody else any harm, and we are going on through with it just like it is.' I said, 'All right.' Mr. Orr's testimony about there being some small children in the room is correct. Mr. Alexander was not there. Homer said, 'I guess we had better go in the other room. Let's go in the other room and talk this over.' I followed them in there. When

we got in there, I made the same statement that I had made to them prior to that time. Neither of the young ladies that had come with me to the Castleman home went into the room with us. I did not feel there would be any such statements as made by the witnesses, or I would have taken them with me. They repeated in substance the statement as to the guilty party that they had made to me before we went into this private room. No violence was offered to me at any time by either of the parties. They threatened me—one man did—the day after the court was over here, when they tried Herman, right down here in this courthouse. I was called outside, but I did not go out. No, the family hasn't been ganging me in great gangs. Yes, sir, I saw the baby this morning. My eyes are brown. I never noticed the baby's eyes. The baby had red hair. I did not make any statement to the family that I had been sent out by a couple of big shots that told me to marry Opal, and if I didn't I would be put in the penitentiary. No, sir, I did not make such a statement. A lot of the other testimony they stated was not true. Yes, sir, I went out to the Castleman home as I have stated, and proposed to marry Opal. I was invited by the family, on account of the little children, to go into a private room. I didn't know what their purpose was for doing it. That's what they done. I didn't tell them that a couple of big shots had sent me out there, and if I didn't marry Opal, I would be sent to the penitentiary. That didn't happen. Yes, sir, I testified in the preliminary hearing in this county, at Hollis, the latter part of the year, 1936, and on December 7, 1936, in the district court here, that prior to February 1, 1935, I had had intercourse with Opal. In my testimony I made that statement, and the incident I related of the occurrence out at the Slab, and I still say that the testimony I gave on that day and date is the truth; and as a matter of fact, I did in September, 1934, have sexual intercourse with Opal Castleman in a Model A Ford out there within 50 feet of the school.

"By Mr. Pullen: Q. And you still say, as a matter of fact, you still look this jury in the eye and say that that testimony you gave on that day and date is the truth, and as a matter of fact you did, in September, 1934, have sexual intercourse with Opal Castleman in a Model A Ford, out there in 50 feet of the school party? You say now to the jury you did do those things, and your testimony in De-

cember, 1936, is true and correct, and still say that's correct now? A. Yes, sir, I do."

Bernice Wilkerson, testifying for the defendant, testified:

"I was with Wayne Scott the night he went down to the Castlemans'. When we got to the house, they asked us in, and we sat there and talked awhile. We waited until they all got in the room. Wayne said, 'Mrs. Castleman, I have come up here on a proposition to settle all this. I will marry Opal, and settle all the trouble, and have all the responsibility on myself. All the school girls know I have had things to do with Opal.' When Wayne said that, they asked the older folks in the other room. They did not give any reason for going in the other room. I was not asked to go in the other room with them. Besides Wayne and myself, Laverta Wilkerson and Ruby Tyson were with us."

On cross-examination the witness stated that she would have gone in the room with the parties if they had asked her to go. There were some small children in the room.

"I am 16 years of age now. I was 15 at that time. The other girls were 15. I testified in the case and made the same statement of facts that I am testifying to now. Wayne told them that he would marry Opal and get rid of all the trouble, and as stated before, that all the school girls knew he had had affairs with Opal. Yes, sir, I knew of Wayne and Opal having had affairs or relations. I saw them go in the car shed one night. It was after February 11, 1935. I have been friends, neighbors, and associated with Opal Castleman and her family before this matter came up. I have not visited her since. Nor have I visited Wayne Scott since. I have spoken to Wayne. Opal has never spoken to me, and I have never spoken to her. No, I wasn't out at the Slab that night."

On redirect examination, the witness stated she just heard the school girls talk about Wayne taking Opal Castleman out to the Slab that night.

"At the time this transaction transpired, the Scott

family, Castleman family, and my family were all good friends."

Laverta Wilkerson stated that she went to school in the O. M. Community, and that she was there the day Wayne Scott and Opal Castleman had a date to go to the Slab.

"Opal told me the day she left the school, she was going to the Slab with Wayne that night. I went with Wayne, Bernice, and Ruby Tyson down to the Castleman home last fall sometime. The families were all neighbors and friends. We were invited into the Castleman home. Wayne said to Mrs. Castleman, 'We have come up here to make a proposition with you. I will settle things all myself. I am to blame, you know. All the school girls know I have been with her, and I will settle this right now if you will do a little reasoning with me. I will take it on myself.' The parties then left the room at the suggestion of Homer Alexander. Alexander said, 'Let's us old folks go in the other room.' The reason, I suppose, they went together into the other room was that they did not want us to hear what they said. We were not asked to go into the other room with them."

On cross-examination the witness stated:

"They didn't tell us to stay out. I went up there with Wayne, Ruby Tyson, and Bernice Wilkerson. Herman Rhodes did not ride up there with us. He came and got us girls, but did not go up to the Castleman home. Herman Rhodes did not tell me about trying to get Wayne Scott to marry the girl. Wayne is the one who asked us to go up there. I don't know whose car it was. We drove Herman to his father's, and let him out there. The girls in basketball wore overalls. They never did wear print dresses. I didn't hear Wayne say anything about big shots sending him out to the Castleman home or what they would do for him if he did not do certain things. I know Wayne went to California before we went with him over to the Castleman home. He hadn't been back but a short time prior to the time we went with him.

"By Mr. Miller: It is stipulated and agreed that Ruby Tyson, who went with Laverta and Bernice Wilkerson to the Castleman home and who is now out of the state, would, if present, testify to the same state of facts as were offered

by Bernice and Laverta Wilkerson. By Mr. Pullen: That's all right."

The foregoing is the substance of the testimony introduced in the trial of Wayne Scott in this case.

Ten errors have been assigned by the defendant, alleged to be sufficient to warrant this court in reversing this case.

The first, seventh, and eighth assignments will be considered together as the first assignment relates to the action of the court in overruling the defendant's motion for a new trial, and the other two assignments relate to error of the court in refusing to enter a directed verdict of not guilty, for the reason the verdict of the jury was not sustained by competent evidence to prove the defendant guilty of the offense charged; and error of the court in refusing to sustain a demurrer to the plaintiff's evidence.

As shown by the evidence, this case seems to be one of spite or persecution, for the reason that the relatives of Opal Castleman, who unfortunately had become pregnant by someone, seem to have desired to place the guilt upon a man by the name of Herman Rhodes.

It is always sad to know any young lady yielding her virtue to a man; and sadder still is it, when she becomes pregnant and brings an illegitimate child into the world.

The crime this defendant is charged with, if guilty, is one condemned by all honest, law abiding citizens. You can guard against those who break into your home or your place of business; but the tongue of the perjurer cannot be stilled by guarding or by attempting to restrain the perjurer from talking.

Yet, a man charged with perjury is entitled to a fair and impartial trial according to the law and evidence. It matters not how strong the feeling against one charged with perjury may be; that does not deprive him of his constitutional and statutory rights under the law.

It is disclosed by the record in this case that Miss Opal Castleman's family, the Scott family, and the Wilkerson family were all friendly; and the children had visited back and forth and gone to the same school part of the time. Some time after the alleged pregnancy of Opal Castleman, the defendant in this case left the state and went to California. He came back within two months to his home in the neighborhood of where the Castlemans lived. Shortly after his return, a warrant was sworn out for a man by the name of Herman Rhodes, charging him with rape in the second degree. Miss Castleman was then between the age of 16 and 18 years.

A preliminary hearing was held, and the proof was that the defendant in this case was subpoenaed as a witness for the state. In the examination in the preliminary trial, the defendant stated that one night while attending a school meeting at what was know as the Slab, the defendant and a number of young ladies, including Miss Castleman, attended this school meeting; and that he and Opal Castleman went back out into the car in which they had driven to the Slab, it being a tudor car, and got into the back seat of this car. While there that evening, he had sexual intercourse with Miss Opal Castleman, the party alleged to have been raped by Herman Rhodes later.

Rhodes was bound over and tried in the district court. In the district court the defendant in this case was not subpoenaed by the state, but by the defendant Rhodes. He again testified to the fact that he had sexual intercourse with Miss Castleman at the Slab, reiterating in substance the same statement that he had made in the preliminary trial.

The record discloses that Rhodes was acquitted.

The record, also, shows that every time the defendant was called to testify under oath he stated positively, giving the place and date where he first had sexual intercourse with Miss Castleman. Miss Castleman, who was the prose-

cutrix in the case of State of Oklahoma v. Herman Rhodes, charged with rape in the second degree, denied that the defendant in this case had ever at any time had sexual intercourse with her prior to or subsequent to the alleged date Herman Rhodes was charged with having sexual intercourse with her.

The defendant was prosecuted under section 2406, O. S. 1931, 21 Okla. St. Ann. § 491:

"Every person who having taken an oath that [he] will testify, declare, depose or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states any material matter which he knows to be false, is guilty of perjury."

The defendant does not dispute the fact that he testified that he had had sexual intercourse with Opal Castleman prior to the alleged date that Herman Rhodes was accused of having committed second degree rape upon her. There is no dispute that the prosecutrix gave birth to a child. Nor is it disputed that Wayne Scott was a friend of Miss Castleman, and had attended school with her, and was with her at the Slab on the night he says that he had intercourse with her in the car they drove to the Slab in, which car was parked near the school where the entertainment was being given.

The only question for this court to decide is, Is the proof in this case sufficient to sustain a conviction of perjury against the defendant?

When he testified to the intercourse he had with the prosecutrix, he gave the date, and place as being in the car near the Slab where the school entertainment was being held.

In Pilgrim v. State, 3 Okla. Cr. 49, 104 P. 383, this court fully discussed what proof was necessary to establish the crime of perjury. In the fifth paragraph of the syllabus, the court stated: "Perjury consists in swearing willfully

and corruptly, contrary to the belief of the witness, not in swearing rashly and inconsiderately according to his belief."

In the sixth paragraph of the syllabus in Pilgrim v. State, supra, the court stated:

"Corrupt motive is indispensable to perjury; and one having knowledge respecting the fact, who testified, however positively, only what he believes to be true, can be guilty of no crime, although he was 'mistaken.'"

To consist of perjury the statement made must be not only false, but the party making it must know it to be so. Pilgrim v. State, supra; Cutler v. Territory, 8 Okla. 101, 56 P. 861; Nelson v. State, 32 Ark. 192.

In Shoemaker v. State, 29 Okla. Cr. 184, 185, 233 P. 489, this court in the second paragraph of the syllabus stated:

"A conviction for perjury cannot be had upon proof alone that accused made contradictory statements under oath. The state must prove by extrinsic evidence that the statement upon which the prosecution is founded is false."

In the third paragraph of the syllabus, in Shoemaker v. State, supra, the court stated:

"Where perjury is based on contradictory statements, under oath, the falsity of one of such statements as a basis for perjury cannot be proven by the unsworn statements of the accused."

This court has repeatedly held that no person can be lawfully convicted of perjury on the unsupported testimony of one witness; and has held further that the charge should be supported by at least two witnesses, or by one witness and corroborating circumstances. This rule, in different forms, has been followed by courts generally, and is stated in 21 R.C.L. 272:

"That the contradictory evidence of one witness alone is never sufficient, as it merely establishes an equilibrium, and therefore additional weight is necessary to turn the

proof against the defendant. The corroboration of a single witness for the prosecution must be by proof of independent and material facts and circumstances tending directly to corroborate the testimony of the witness, and must be of a strong character, and not merely corroborative in slight particulars, and it must contradict in positive terms the statement of the accused." Shoemaker v. State, 29 Okla. Cr. 184, 233 P. 489.

In Blakemore v. State, 39 Okla. Cr. 355, 265 P. 152, this court in the second paragraph of the syllabus stated:

"A conviction for perjury cannot be had upon proof alone that accused made contradictory statements under oath. The state must prove by extrinsic evidence that the statement upon which the prosecution is founded is false."

The proof in this case conclusively shows that the defendant on different occasions testified to the fact that he had had at a certain time, and prior to the alleged rape by Herman Rhodes, sexual intercourse with the prosecuting witness, Opal Castleman. The prosecutrix denied the statements of the defendant, and said that he had never had sexual intercourse with her.

The testimony of the defendant and prosecutrix amounts to an equilibrium of the testimony. He asserts that he did have intercourse with the prosecuting witness, and the prosecuting witness asserts that he did not.

The state, in order to bolster up the prosecuting witness, tried to show by a witness who was at the Slab that night of the alleged intercourse by the defendant with the prosecuting witness, that she had been with the prosecuting witness and stayed with her all of the way through the school program, and that the prosecuting witness did not leave her at any time.

This statement is contradicted by the sister of the defendant, in which she says that her brother and the prosecuting witness were absent from the school building for sometime, and went out towards the car.

The only other testimony attempted to be shown by the state is by statements of the relatives of the prosecutrix, in which they claim that when the defendant went down to her home and offered to marry her, after he had learned that she was pregnant, when they had taken the defendant in a room separate from the parties that had come to the Castleman home with him, he stated that he had not had intercourse with Opal; and that at another time, when he was up near the bank building, in conversation with some of the prosecutrix's relatives, he again stated to them that he had not had sexual intercourse with her.

The defendant denied that he made these statements. It is not contended by the state that the defendant was under oath at that time; nor is it shown that, at the time these relatives of the prosecutrix claim they talked to the defendant, he was under any moral obligation to disclose to them any private relationship, amounting to cohabitation and sexual intercourse with the prosecutrix.

These statements are not claimed to have been made by the defendant while under oath; and they are not such statements as are sufficient to corroborate the prosecuting witness in her statement that she had not cohabited or had sexual intercourse with the defendant, and are not sufficient to sustain a charge of perjury.

The testimony against the defendant, other than the testimony of the prosecutrix, is testimony of an indefinite and uncertain character, and seems to have been attempted to have been built up by the relatives of the prosecutrix, because of the fact that they were angered at the defendant for the testimony he gave in the trial of State v. Herman Rhodes, who was acquitted of the charge of rape in the second degree on the person of Opal Castleman.

As they do not deny that the defendant proposed to marry the prosecutrix, and that he stated to them he was to blame for her being pregnant; nor did they deny the fact that they told the defendant that they had the right party,

and for him to stay out and keep out of it, and it would be better for him to leave the country, clearly showing that they were trying to bind the defendant and convict him on alleged, uncertain, and indefinite statements, alleged to have been made by the defendant. All of which he denied.

In Cude v. State, 42 Okla. Cr. 357, 276 P. 240, in the second paragraph of the syllabus, the court stated:

"Where the evidence in a case to sustain a verdict of guilty is of such a weak and uncertain character that the court cannot say that the jury was not influenced by prejudice, passion, or irrelevant and incompetent testimony, a great deal of such testimony appearing in the record, this court will order a new trial."

In Jefferson v. State, 31 Okla. Cr. 44, 236 P. 914, in the body of the opinion the court stated:

"The salutary rule, as has frequently been announced by this court, is that the jury are the exclusive judges of the credibility of the witnesses, and where there is evidence from which the jury may reasonably and logically draw the conclusion of the defendant's guilt, although the evidence is conflicting, the verdict will not be disturbed. Still, where there is a dearth of evidence and the guilt of an accused is not a logical deduction from the facts proven, the evidence is insufficient and the verdict will be set aside." Thompson v. State, 40 Okla. Cr. 251, 268 P. 314.

Without prolonging this opinion further, it is apparent that the evidence introduced against the defendant is not sufficient to sustain a verdict of guilty on a charge of perjury.

We, therefore, hold that the motion for an instructed verdict and his demurrer to the evidence was well taken, and should have been sustained. The verdict is not supported by the evidence, and on account of the insufficiency of the evidence, the case is reversed and remanded.

DOYLE, P. J., and BAREFOOT, J., concur.