Marvin **CAMERON**, Plaintiff In Error,

v.

**STATE** of Oklahoma, Defendant in Error.

No. A–13008.

Court of Criminal Appeals of Oklahoma.

Oct. 11, 1961.

Malcolm Baucum, Duncan, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

This is an appeal brought by Marvin Cameron from a judgment and sentence rendered against him in the district court of Comanche County, Oklahoma. Therein he was sentenced to a term of one year in the penitentiary for perjury.

The charge was instituted by the county attorney's information for the crime allegedly committed by giving false testimony before a lawfully called grand jury, on November 18, 1959.

The substance of the charge was that the defendant, as justice of the peace in said county, after issuing a search warrant to Norman Hunter, an agent of the Oklahoma

State Crime Bureau, directing said officer to search the premises of one L. R. Walker, a bootlegger and seize certain intoxicating liquor being unlawfully in Walker's possession (37 O.S.1951 § 35) did, by telephone, tip the said Walker off of the impending search. It was further charged in the information that from time to time defendant received gifts of intoxicating liquor from the said Walker, all of which things he denied doing in his testimony before the grand jury; which testimony was known by him to be false.

The defendant was tried before a jury. The jury found him guilty and fixed his punishment at one year in the state penitentiary, and on October 18, 1960 judgment and sentence was entered in keeping with the verdict, from which judgment and sentence this appeal has been perfected.

It appears that in investigating the illicit liquor traffic in Lawton, Oklahoma, with a view of possibly instituting a federal charge of conspiracy, Mr. James T. Rogers, a special investigator of the Internal Revenue Service, Alcohol and Tobacco Tax Division, was the principal actor in the proceedings. His investigation covered a period from January 27, 1959 to April, 1959.

Mr. Rogers testified that he had Mr. Walker's permission to listen in over a kitchen extension to a telephone conversation between the defendant Cameron, the justice of the peace, and Walker, the bootlegger, on March 20, 1959 relative to a tip-off concerning a raid to be made on Walker's premises.

It seems that Rogers testified: "I used technical equipment which I attached to the extension of the telephone and attached to a recorder." Thus he was able to record the telephone conversation between the bootlegger and the justice of the peace. The tape recording was offered and received in evidence, over defendant's objection and exception.

The defendant's first contention is based upon alleged error of the trial court in admitting the introduction of this recorded conversation. The defendant contends that the tape recording of the telephone conversation between the defendant and Walker was obtained and published in violation of the plain provisions of 21 O.S.1951 §§ 1757 and 1782, as well as the provisions of Art. II, §§ 21 and 30 Oklahoma Constitution.

In the latter contention the defendant finds sustenance in the dissenting opinion of Judge Brandeis in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 as applied to the interpretation of the Fourth and Fifth Amendments to the United States Constitution in a wire-tapping case.

Therein unlawful intrusion on a telephone conversation, it was argued, is comparable to unlawful search and seizure, and self-incrimination. As will be hereinafter pointed out, we do not believe it is reasonable or necessary to extend present constitutional provisions that far.

The pertinent parts of the provisions of Art. II of the Oklahoma Constitution read:

"21. No person shall be compelled to give evidence which tends to incriminate him, except as in this Constitution specifically provided; * * *

"30. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized."

The provisions of 21 O.S.1951 § 1757 are as follows:

"Any person who maliciously, or without legal authority, removes, injures, or obstructs any line of telephone or telegraph, or any part thereof, or appurtenances or apparatus therewith connected, or severs any wires thereof, or fraudulently or without legal authority, intercepts any message, communication or conversation in its passage over such wires, or who fraudulently or without legal authority connects to any telephone or telegraph line

or wire any instrument or other apparatus capable of being used in intercepting messages, communications or conversations, is guilty of a misdemeanor and upon conviction shall be punished by a fine of not less than fifty dollars, nor more than five hundred dollars, or imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment."

And 21 O.S.1951 § 1782 reads:

"Any person who shall disclose the contents of any telegraphic dispatch or telephone message or communication, or any part thereof, addressed to or which he knows to be intended for another person without the permission of such person, except upon the lawful order of a court, or the judge thereof, with intent to cause injury, damage or disgrace to such other person, or which does in fact cause injury, damage or disgrace to such other person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days, nor more than one year, or by both such imprisonment and fine. Provided, that nothing herein shall apply to public officers in the discharge of their duties."

This is a case of first impression in Oklahoma. Since it is a "land-mark case", we must of necessity resort to interpretations of statutes by states from which our statutes were derived, as well as those of other jurisdictions involving similar statutes.

It is correctly conceded by both the State and the defendant that our statutes, 21 O.S. 1951 §§ 1757 and 1782 were derived from the 1887 Dakota, and the California statutes. Because of the similarity between the California statute and our Oklahoma statutes, we are of the opinion that possibly California is more nearly the state of derivation.

The pertinent part of the California statutes is as follows:

"§ 591. Every person who unlawfully and maliciously takes down, re-moves, injures or obstructs or makes any unauthorized connection with any line of telegraph or telephone, or any other line used to conduct electricity, or any part thereof, or appurtenances or apparatus connected therewith, or severs any wire thereof, is punishable * * *" etc.

"§ 640. Every person who, by means of any machine, instrument, or contrivance, or in any other manner, wilfully and fraudulently, or clandestinely taps, or makes any unauthorized connection with any telegraph or telephone wire, line, cable, or instrument under the control of any telegraph or telephone company * * * is punishable * * *." etc.

The above quoted section of the Oklahoma statutes (21 O.S.1951 § 1757) was designed, among other things, to protect not only the privacy of users and subscribers of telephone service, but the telephone company facilities against intermeddling mischief makers and trespassers. The pertinent part of this section, as applied herein, relates to any person, private or public, who without legal authority intercepts a telephone communication passing over the telephone company wires, or who without legal authority connects to any telephone any instrument or apparatus capable of being used to intercept communications, messages or conversations.

That such an operation constitutes "wire-tapping" there can be no doubt, as it consists of the taking or seizure of a communication while on its way, by physical interruption before its arrival at its destination. Its destination is deemed to be at both ends of the facilities of the company providing the service, including its extension lines. United States v. Guller, D.C., 101 F. Supp. 176; People v. Trieber, 28 Cal.2d 657, 171 P.2d 1; United States v. Polakoff, 2 Cir., 112 F.2d 888, 134 A.L.R. 607, certiorari denied 311 U.S. 653, 61 S.Ct. 41, 85 L.Ed. 418.

And see Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126, and the annotation concerning the admissibility of evidence obtained by wire-tapping as

affected by § 605 of Federal Communications Act appearing on page 1608 (2 L.Ed. 2d) § 5, footnote 4, where it is said:

"As noted at page 242 of the annotation in 97 L ed. the Court of Appeals for the second circuit, in United States v. Polakoff [citing] held that a physical interruption of a telephone circuit through a consented-to attaching of a recording machine on a telephone extension in an adjoining room amounted to an 'interception' within the meaning of § 605, so as to render incompetent evidence obtained by means thereof."

■ Title 21 O.S.1951 § 1782 makes the disclosure of a telephone message or conversation, or any part thereof, known to be intended for another person, without his permission, except by lawful order of court so to do, with the intention to bring injury, damage or disgrace to such person, or which results in the same, a violation of the law. This provision is directed primarily against telephone eavesdropping interceptors. Then comes the proviso that the section shall not apply to public officers in the discharge of their duties.

As applied to the facts herein, we are basically concerned, under these statutes, with the problem of unauthorized interception and disclosure of telephone conversations or messages. What are the facilities affected by interception, and what is an unauthorized interception? The provisions of § 1757 are not limited to the main telephone line alone, but cover an extension thereof into an adjoining room as a part of the company's facility, which is tapped for the purpose of interception. United States v. Polakoff, supra.

The provisions of § 1782 simply prohibit the disclosure of an intercepted conversation, or any part thereof, known to be intended for another person, without his permission.

This immediately raises the question, who can give consent or permission to such interception and disclosure?

■ Of course the parties to the conversation may waive their right to privacy and consent to the interception of a telephone message on the line.

In this connection Judge Learned Hand said, in United States v. Polakoff, supra, 112 F.2d at page 889:

"Every telephone talk, like any other talk, is antiphonal; each party is alternately sender and receiver and it would deny all significance to the privilege * * * to hold that because one party originated the call he had power to surrender the other's privilege. There cannot be the least doubt of this as to the answers of the party called up; and while it might indeed be pedantically argued that each party had the power to consent to the interception of at least so much as he said, that would be extremely unreal, for in the interchange each answer may, and often does, imply by reference some part of that to which it responds. It is impossible satisfactorily so to dissect a conversation, and the privilege is mutual; both must consent to the interception of any part of the talk. * * *

"Moreover, the recording was an 'interception.'

" * * * The statute does not speak of physical interruptions of the circuit, or of 'taps'; it speaks of 'interceptions' and anyone intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can have no importance; it is the breach of privacy that counts. We need not say that a man may never make a record of what he hears on the telephone by having someone else listen at an extension, or, as in the case at bar, even by allowing him to interpose a recording machine. The receiver may certainly himself broadcast the message as he pleases, and the sender will often give consent, express or implied, to the interposition of a listener. Party lines are a good illustration; and it would be unwise to

try in advance to mark the borders of such implications. Here, however, we need not be troubled by niceties, because, no matter what the scope of any such implied consent, it cannot extend to the intervention of prosecuting agents bent upon tapping the 'sender'. criminally. Violation of the privilege, we are admonished, is so grave a dereliction as to be 'destructive of personal liberty' (Nardone v. United States, 302 U.S. 379, 383, 58 S.Ct. 275, 277, 82 L.Ed. 314) and if it is not to be sham and illusion, it must protect its possessor at least against such intrusions."

Applied to the case at bar, the strain of logic in United States v. Polakoff, supra, makes the waiver of the protection against interception under our statutes a dual matter, a privilege belonging to both parties to the telephone conversation. But this right in no way may be independently infringed by an interceptor.

In this respect our statutes differ from § 605 of the Federal Communications Act of 1934 (47 U.S.C.A. § 605) which places the right of waiver with the sender of the communication. Our statute contains no such provision. The federal statute further differs from our statute in that it does not speak of physical interception of the circuit or taps, but interception to which the communicants do not consent. It is not directed at interference with the company's physical facilities, but invasion of the right of privacy by disclosure of an intercepted conversation. The federal statute is in many respects unlike ours, but nevertheless the interpretation in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 163, 2 L.Ed.2d 134, rehearing denied 355 U.S. 925, 78 S.Ct. 363, 2 L.Ed.2d 355, wherein the listening in was over an extension telephone line in an adjoining room, no tapping was involved. That case is applicable herein, holding that the communication itself is not privileged, and one party may not force the other to secrecy merely by using the telephone. It was therein specifically held that either party to a telephone conversation may record the same and publish it if it can be affected without tapping the company lines. Under our statutes such is true.

In the Rathbun case, supra, the court said:

"The conduct of the party would differ in no way if instead of repeating the message he held out his handset so that another could hear out of it."

Cited is United States v. Polakoff, supra.

Applied herein, if the evidence had been obtained by listening in over the receiver of the extension, either the justice of the peace or the bootlegger could publish the conversation, as the latter did in his testimony. Or if the bootlegger had permitted someone to listen in with him over his receiver, or his extension, such a third person could disclose what he thus heard by permission of the party for whom the message was intended or by order of the court so to do. But neither party under our statutes can tap the telephone lines, for such would be an unauthorized infringement on the company lines.

It is clear that our statutes (§ 1757) not only protects against unauthorized interception, but the right of privacy (§ 1782) against disclosure of telephone conversations intended for another person than the interceptor.

In the Rathbun case it was held that because the listening in was consented to by one of the parties, the listening in being only on an extension of the company line, there was no infringement of the provisions of § 605, since there was no proscribed interception revealed by the record.

Quite the contrary is true here, for definitely under this record there was an interception, as the agent testified: "I used technical equipment which I attached to the extension of the telephone and attached to a recorder."

It may be argued that there is practically no difference in listening in over the extension (with permission granted) and intercepting the same with an attachment close to the end of the line, which the agent herein employed.

To such we cannot subscribe, for if an attachment may be made over the shortest distance from either end of the line, it can be made three miles or three hundred miles from either terminal point of the telephone facility. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944.

Any interception as was effected by the agent herein is prohibited. Our statutes clearly place the power of listening in on, and disclosure of, a telephone conversation with the parties, but even they are not empowered to tap or grant permission to another to tap company lines to a station or extension thereof.

Under our statute the prohibition against interception and the prohibition against attaching any instrument thereto for such purpose was intended as a protection of the means of communication in order that the telephone company might at all times be in control of its facilities for the operation of which it is responsible. It is designed to prevent any unauthorized person from interfering with the means of communication. Such interference is not a matter of degree or distance, but a matter of positive prohibition in any degree or distance.

This brings us to the point under the foregoing interpretation, could the bootlegger in this case, as a telephone subscriber, grant permission for the federal agent to tap the telephone extension? The answer, in line with what has been said, is "No", for the reason no proprietary interest in or control of the use of any of the facilities that enable him to authorize physical intercepting connections to be made thereto. People v. Thieber, 28 Cal.2d 657, 171 P.2d 1, 4, from which we quote:

"That the authorization of an individual subscriber alone, however, does not make a connection to his station lawful within the meaning of section 640 [California Penal Code] is clearly indicated by the provisions of that section. These provisions relate only to connections to company controlled facilities, a limitation that indicates that they refer to the authorization of the company controlling the network involved. Moreover, the provisions prohibit not merely unauthorized connections to wires leading to stations of individual subscribers, but the tapping of 'any telegraph or telephone wire, line, cable, or instrument under the control of any telegraph or telephone company.' The section thus applies to tapping whether it be of a main or local switchboard or other instrument of any variety, or whether it be of a main trunk or smaller line, wire, or cable. An individual subscriber ordinarily has no interest in or control of the use of any wire, line, cable or instrument that transmits a number of messages from any sources at the same time. * * * A statute should be read and considered as a whole to determine the legislative intent. People v. Monroney, 24 Cal.2d 638, 642, 150 P.2d 888; see 23 Cal.Jur. 760. Since in all these instances only the telegraph or telephone company can authorize a connection, it cannot be doubted that the section requires company authorization when a line leading to the station of an individual subscriber is tapped.

"Even if the line to which the connection is made should lead only to his station it would not be reasonable to allow the subscriber alone to authorize connections unknown to the company for the additional reason that he does not have exclusive use of this line. Other persons communicating over the line from an outside telephone are also within the protection of section 640, but they would not be protected if the subscriber alone could authorize a connection."

So, also, in Oklahoma, any subscriber or user who directs a connection to the lines or extensions thereof, or permits another without the authority of the telephone company to make it, becomes a principal to the crime, and subject to prosecu-

tion under the provisions of 21 O.S.1951 § 172. It is obvious that Walker could not grant permission for the tap in this case.

To emphasize, we repeat that neither party on the line, whether subscriber or not, under our statutes could legally authorize such tap or physical interruption to be made. Under the right of privacy, the telephone company could not authorize another person to tap a subscriber's line. People v. Trieber, supra. Thus § 1757 of our statute protects the telephone company's facilities against unauthorized listening-in connections to its lines, and § 1782 prohibits the disclosure of any part of an intercepted telephone conversation. Under our statutes, there can be no legal tap of such facility without the consent of the person who originates the conversation, the one who responds to it (United States v. Hill, D.C., 149 F.Supp. 83), and the telephone company. A legal tap could not be made by any party in any other way. We can hardly conceive of a situation where such consent could be obtained. It is of public concern that the complete telephone system, controlled by the company, be supervised in such manner that all persons using such facilities may be assured that their conversations will not be intercepted by any interference made without their knowledge and under the company's direction, or the same be published contrary to law. The mutuality of the respective interests of the three parties involved require as much, and the user-public is entitled to expect no less, if both privacy of conversation and freedom from interference of company facilities is to be maintained.

 But this does not mean, as applied to the telephone company, that the right of privacy prohibits the telephone company under permissible circumstances from listening in. The telephone company in the exercise of its control, regulations and policing of its facilities, has legal authority by implication of law so to do. Its operation of a public facility regulated by law creates its obligation to do so. But this it can do only to maintain the respectability of its system and prevent abuses by sub-

scribers or users of its facilities. See Stevens v. State, Okl.Cr., 302 P.2d 491, where such policing of company facilities was incidentally involved. However, the telephone company itself, through its authorized agents, is permitted to listen in only for legitimate purposes. Officials of the telephone company, or its employees under the law are not permitted to divert the company's facilities to unlawful operations or disclosures and officials or employees party to such operations would not be immune from prosecution.

It thus appears that the tap made in this case was without legal authorization, and clearly falls within the prohibitive provisions of § 1757.

 Referring again to the provisions of § 1782, the matter recorded not being legally obtained, was not the subject of disclosure by the officer, even by order of the court. If, however, a conversation is overheard by an officer of the law in a manner not forbidden by law, it may be disclosed by him, if the discharge of his duties so requires, without such order. The order of the court can never clothe an intercepted message or conversation with the habiliments of legality, essential to its admissibility into evidence. Moreover, the proviso of § 1782 was not intended as a license for official violation of the provisions of § 1757 to intercept evidence by the means here employed. It is not within the contemplation of law that official duties should ever encompass sanctions to use evidence obtained and only obtainable by a criminal act. As was said by Justice Brandeis in his dissenting opinion in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 572, 72 L.Ed. 944, and concurred in by Justice Holmes:

"* * * It is also immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in in-

586

sidious encroachment by men of zeal, well-meaning but without understanding. * * *

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

We are of the same opinion. We cannot say that the officers may never employ unlawful methods in law enforcement, but we can say that evidence obtained in violation of defendant's constitutional or statutory rights bears the taint of official law violation, and should be excluded by the trial judge, and when such is not done, a conviction based thereon will be reversed.

The proviso in § 1782 is intended to permit the officer to disclose and to testify to evidence legally obtained, without an order of the court so to do. Whenever an objection is raised to the admissibility of evidence on the ground it was unlawfully obtained, the trial court should exclude the jury, and determine at once that issue before admitting the evidence. In no other way can it effect the purpose of these statutes which is not to make fish of the citizens and fowl of public officers. So far as law enforcement is concerned, they are both of the same breed—both subject to and bound by the law—all of it. We have repeatedly held that the officers of the law are not licensed by the law to violate the law in the discharge of their duties. Jones v. State, 88 Okl.Cr. 243, 202 P.2d 228; Cawley v. State, 96 Okl.Cr. 53, 248 P.2d 273.

In the Jones case, above cited, we said:

"An officer seeking the enforcement of one law should not violate another in order to accomplish his purpose."

In People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 914, 50 A.L.R.2d 513, the Supreme Court of California held:

"It is contended, however, that the police do not always have a choice of securing evidence by legal means and that in many cases the criminal will escape if illegally obtained evidence cannot be used against him. This contention is not properly directed at the exclusionary rule, but at the constitutional provisions themselves. It was rejected when those provisions were adopted. In such cases had the Constitution been obeyed, the criminal could in no event be convicted. He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught. 'It is vital, no doubt, that criminals should be detected, and that all relevant evidence should be secured and used. On the other hand, it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole."

It is argued by defendant that this evidence obtained herein in the manner outlined, is analogous to that obtained by unlawful searches and seizures, and under circumstances requiring one to give evidence against himself, and is inadmissible.

To the contrary, it has been suggested that we might even sustain this operation

on the theory of search and seizure. The analogy is in many respects strong and impelling, because in both searches and seizures, and evidence obtained by wire tapping, include an invasion of the right of privacy. But there the analogy ends, for there is a vast difference when these rights are measured in light of the provisions of Art. II, § 30, Okl.Const., to the effect, "The right of the people to be secure in their persons, houses, papers and effects are not to be violated."

It is impossible to reconcile the concept of an intangible thing, such as a telephone conversation, as the subject of seizure as an effect, defined in the Constitution. Basically, that was the reason for the majority opinion in Olmstead v. United States, supra, holding that wire-tapping did not amount to a search and seizure within the meaning of the Fourth Amendment to the United States Constitution, and consequently the Fifth Amendment requiring one to give evidence against himself was not violated.

Such is our conclusion herein. We have no basis within the definitive terms of the law to hold that wire-tapping falls within the ambit of search and seizure. We are not at liberty to hold that Art. II, § 30, and 22 O.S.1951 §§ 1221 to 1241 inclusive were intended by the law makers to cover the issuance of orders authorizing wire-tapping as an instrument for obtaining evidence. Our constitutional and statutory provisions do not go that far. We are not so situated as in the State of New York, the constitution of which contains the identical provision of our Art. II, § 30, supra, and then provides:

"The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof. Adopted by Constitutional Convention of 1938; approved by the people Nov. 8, 1938." Const.N.Y. art. 1, § 12.

If the people of Oklahoma wish to remove our wire-tapping statutes from the books, as a protective refuge or sanctuary for law violators, it is easily within their grasp through the medium of a constitutional amendment such as New York's, for then they put it within the same constitutional status as search and seizure. As the law in Oklahoma now stands, the right of privacy in the use of a telephone has greater sanctity than the right of privacy in the home. While we are impressed with the idea that this differentiation is unsound, as judges we are not at liberty to correct it, since that is a matter of legislation for the people.

There is another reason just as cogent as to why we do not engage in a discussion of the constitutionality of wire-tapping as analogous to searches and seizures, and that is because the question was not raised below in the trial, and there is no proper predicate for a decision on the matter. The State did not seek to sustain this tap on the theory of its constitutionality, and the question not being raised in the trial court, we would be, so to speak, fighting imaginary windmills if we sought to give it even an academic treatment.

The rights covered by the statutes are amply protected, and we do not deem it necessary to pass on the constitutional question thus raised by the defendant. We are of the opinion, where constitutional interpretations can be avoided and the rights of parties preserved under statutory construction, such course should be pursued.

Hence, we by-pass affirmative decision on the constitutional question. We are not unmindful of the statutes providing for punishment of offenders violating the law in attempts to enforce it. But the courts have found that prosecutions against the officers so doing are seldom fruitful, and that the only method of relief designed to

protect the citizen, is to say proof so obtained will not be received in evidence.

Therefore, we are of the opinion that evidence offered concerning the telephone conversation between the justice of the peace and the bootlegger, intercepted by a federal agent by wire-tapping, was violative of statutory rights, not subject to disclosure according to law, and was inadmissible in evidence.

The question then presents itself, is the bootlegger's evidence, standing alone, sufficient to sustain the conviction? The rule concerning evidence necessary to sustain a conviction for perjury is stated in Wharton's Criminal Evidence, 12th Ed., Vol. 3, § 956, n. 397 thusly:

"It is generally held that to sustain a conviction for perjury there must be the testimony of two witnesses, or the testimony of one witness which is corroborated by other circumstances. * *

"The corroborating evidence in perjury prosecutions must be clear, positive, and strong, so that, in connection with the evidence of the witness who testifies directly, it will convince the jury beyond a reasonable doubt.

"The corroboration must go beyond slight and indifferent particulars. It must tend to show the statements alleged to have been falsely sworn. Corroboration is required for the false testimony as a whole, but not for every constituent element of it. If the falsity of the defendant's statement is proved beyond a reasonable doubt, there is sufficient ground to sustain a conviction."

See also Underhill's Criminal Evidence, 5th Ed., Vol. 3, § 823, p. 1855; 70 C.J.S. Perjury § 67, p. 535. Also 70 C.J.S. Perjury § 70, subd. "d", p. 541, where we find the following:

"Where there are several assignments of perjury, the testimony of a single witness must be corroborated with respect to the assignment concerning which he testified. Proof of one assignment is not corroborated by proof of another, even though all the perjuries were committed at the same time and place."

And to the same effect is 41 Am.Jur. 67, p. 37.

In Madden v. State, 26 Okl.Cr. 251, 223 P. 716, 717, quoting from Conant v. State, 51 Tex.Cr.R. 610, 103 S.W. 897, this court said:

"An accomplice being a discredited witness, in order to meet the statutory rule that no person may be convicted of perjury except upon the testimony of two credible witnesses, or of one credible witness strongly corroborated by other evidence, there must be at least one credible witness besides an accomplice testifying to the falsity of defendant's testimony."

And see Goltry v. State, 24 Okl.Cr. 127, 216 P. 485; Scott v. State, 66 Okl.Cr. 441, 92 P.2d 847.

On the question of the tip-off, the only corroboration thereof is the tapped telephone conversation which is clearly inadmissible and should have been excluded, as heretofore pointed out. There is not any corroborating evidence of Officer Hunter that he made a raid on February 27, 1959 as testified to by the bootlegger. The affidavit for search warrant, the warrant and return were not offered in evidence, if such warrant was ever issued. Only the bare testimony of the bootlegger as to the raid was offered. The evidence was entirely insufficient on this basis.

The evidence as to receiving vodka or liquor from the bootlegger by Cameron is corroborated by the bootlegger's wife alone. Proof of one asssignment of perjury is not corroborated by proof of the other. Both different assignments of perjury must be corroborated by proof independent of each other. The evidence herein does not meet these requirements of the law. 70 C.J.S. Perjury § 70, subdiv. "d", p. 541, supra. Proper evidence of corroboration of each assignment of perjury is wholly lacking, as measured by the foregoing rules.

Under these conditions it is not necessary for us to consider the other assignments of error. The case must be reversed and the defendant discharged, unless the State can produce evidence to meet the foregoing requirements of law.

It is so ordered.

NIX, P. J., and BUSSEY, J., concur.