Jack O. PEARSON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–430.

Court of Criminal Appeals of Oklahoma.

Nov. 23, 1976.

Rehearing Denied Dec. 20, 1976.

Peter K. Schaffer, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., Joe Mark Elkouri, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge.

Appellant, Jack O. Pearson, hereinafter referred to as the defendant, was charged, tried and convicted by a jury in Oklahoma County, for the offense of Conspiracy to Commit Murder in the First Degree, in violation of 21 O.S.1971, § 421, Case No. CRF–74–2921. On the information, George Kriz and Linda Pearson were also named as co-conspirators. However, George Kriz was granted immunity in exchange for his testimony, and the charge against Linda Pearson was dismissed prior to trial. As a result, the defendant was the sole conspirator tried and convicted. He was sentenced to a Five Hundred Dollar fine ($500.00), which was suspended, and a term of two (2) years in the State Penitentiary. From this judgment and sentence, the defendant has perfected a timely appeal to this Court.

The State called as its first witness Mr. George Kriz. Mr. Kriz testified that on August 12, 1974, an individual whom he identified as the defendant came to his house and introduced himself. Mr. Kriz had not met the defendant prior to that time. The defendant then told Mr. Kriz that he "needed a job done." He inquired if he knew anyone who would do it. Mr. Kriz replied that he knew a "thief who would steal just about anything." The defendant then left, but returned the next day to see if Mr. Kriz had contacted anyone. Mr. Kriz said no but the defendant "might go down . . . and talk to Don." [1] Mr. Kriz and the defendant then proceeded to go to Don's house, where Mr. Kriz introduced the defendant to Don Woodyard, but did not listen to any conversation between the two.

Two weeks later, the defendant again visited Mr. Kriz, complaining that Don "hadn't done anything he asked him to do." Mr. Kriz then testified in the following manner:

"MR. MILDFELT:

"Q. Did he tell you what he asked him to do at that time?

"MR. KRIZ:

"A. No.

"MR. MILDFELT:

"Q. Okay. Did he ever tell you why he got in contact with you?

---

1. Don refers to the State's second witness, Don Woodyard.

"MR. KRIZ:

"A. Well he told me he had a job to do, was all." (Tr. 18)

On August 29, 1974, Mr. Kriz was arrested by the Midwest City Police. He was taken to the station, where he spoke by telephone with the defendant. In that conversation he arranged the meeting between the defendant and "Rocco", who in reality was Lieutenant Jack Hill of the Midwest City Police. Shortly thereafter, the defendant met with Lieutenant Hill and Mr. Kriz. After a brief conversation between the defendant and Lieutenant Hill, the defendant was arrested. Mr. Kriz testified that he did not hear the conversation between the defendant and Lieutenant Hill. Furthermore, he testified that he was granted immunity for his testimony.

On cross-examination, Mr. Kriz testified that he never at any time intended to commit a felony.

The State's second witness was Mr. Don Woodyard. Mr. Woodyard testified that on August 13, 1974, Mr. George Kriz brought the defendant over to his home, and introduced him. Mr. Woodyard then testified in the following manner:

"MR. MILDFELT:

"Q. After you were introduced to Mr. Pearson, did you have any conversation with him?

"MR. WOODYARD:

"A. Yes.

"MR. MILDFELT:

"Q. What was the nature of that conversation? What did he say to you and what did you say to him?

"MR. WOODYARD:

"A. Well, he told me he wanted a job done.

"MR. MILDFELT:

"Q. Did he tell you what that job was?

"MR. WOODYARD:

"A. Yes.

"MR. MILDFELT:

"Q. What did he say it was?

"MR. WOODYARD:

"A. That he wanted somebody bumped off.

"MR. MILDFELT:

"Q. Did you ask him what he meant by that?

"MR. WOODYARD:

"A. Yes.

"MR. MILDFELT:

"Q. What did he say to you?

"MR. WOODYARD:

"A. He said he wanted them killed." (Tr. 27)

The witness then went on to identify the intended victims as Mr. and Mrs. Harry Buck, who were the mother-in-law and stepfather-in-law of the defendant. During his conversation with the defendant, Mr. Woodyard received $50.00 from the defendant as a down payment for the "contract." When asked where the defendant got the money Mr. Woodyard testified that the defendant walked back to his car, where his wife was sitting, and returned with $50.00. Mr. Woodyard then told the defendant he would get in touch with "Rocco and Stretch" to get the job done. Further testimony revealed however, that Mr. Woodyard did not know the whereabouts of either Rocco or Stretch, and never made any attempt at contacting them.

Asked whether he had seen the defendant on any other subsequent dates, Mr. Woodyard testified that he saw him on several other occasions. It was during one of those subsequent meetings that the defendant supplied Mr. Woodyard with names and addresses of the intended victims, including car tag numbers and work habits. Mr. Woodyard further testified that on each of these occasions, the defendant's wife was with him, and although she never engaged in any of the conversation, often times she was within hearing distance of the defendant's and Mr. Woodyard's conversations.

On the day of the final meeting between the defendant and Mr. Woodyard, the de-

fendant was angry at Mr. Woodyard for his failure to contact the hit men, Rocco and Stretch. An altercation arose between the parties resulting in Mr. Woodyard telling the defendant to get out of his yard. The defendant left, and the police were called shortly thereafter.

Mr. Woodyard then went to the Midwest City Police Station, where he made a statement and attempted to arrange a meeting by telephone between the defendant and Lieutenant Hill, who identified himself as the hit man, Rocco. The conversation between Mr. Woodyard and the defendant was recorded by the police, with Mr. Woodyard's consent, and subsequently admitted into evidence to corroborate the testimony of the witnesses.[2] The attempted meeting, however, did not take place as a result of this conversation.

On cross-examination, Mr. Woodyard testified that he never intended to contact Rocco and Stretch, that he in fact did not know their whereabouts, and that he never intended to murder anyone.

The State's third witness was Lieutenant Jack Hill of the Midwest City Police Department. Lieutenant Hill testified that on August 28, 1974, Mr. Woodyard came to the police station and gave a statement relating the events of the recent days. A call was then placed to the defendant, and an attempt was made to arrange a meeting between the defendant and Lieutenant Hill, who identified himself as Rocco. This attempt failed, and further attempts were made on subsequent nights. During one of these conversations with the defendant, Lieutenant Hill testified that the defendant became apprehensive and said "hold on for just a minute. My wife is talking to me." (Tr. 49).

Finally, a meeting was arranged between the defendant and Lieutenant Hill posing as Rocco. At that meeting the defendant gave Lieutenant Hill a $20.00 bill, and was subsequently arrested.

Lieutenant Hill further testified that all of these conversations between Mr. Woodyard, George Kriz, the defendant, and himself, were recorded on tapes. The prosecution then moved to introduce all of these tapes into evidence over the defendant's objection. A conference was held outside the presence of the jury, and the trial judge admitted only one of the several tapes sought to be introduced. The jury then heard a taped conversation between the defendant, Mr. Woodyard, the defendant's wife, Linda Pearson, and Lieutenant Hill. The contents of this taped conversation corroborated the testimony of Lieutenant Hill and Don Woodyard.

The State's next two witnesses were Harry and Ann Buck, who were the intended victims. Their testimony essentially provided the background leading up to these events. It was established that there were bitter feelings between the defendant and his wife, and Mr. and Mrs. Buck, as a result of civil proceedings involving the custody of Linda Pearson's children from a prior marriage. Mrs. Buck said that she testified against her daughter in those proceedings. Mr. Buck's testimony verified the car tag numbers given to Mr. Woodyard by the defendant, which corresponded to the car tag numbers of the automobiles he owned.

The State also called Ella Reale as a witness. She testified she was a private investigator, who followed the defendant and his wife to 1217 Ferguson, in Midwest City, on August 13, 1974. She then followed them to 516 Shortway, then to 421 Bowman, then back to their home, where the defendant and his wife changed cars and returned to 516 Shortway.[3]

---

2. The record is mute as to the method used in recording this conversation. The defendant's counsel does however, repeatedly refer to the tape as an "electronic recording."

3. It had been developed in the testimony of other witnesses that 1217 Ferguson was the home of George Kriz; 421 Bowman was the residence of Don Woodyard; and it was not established who lived at 516 Shortway.

The State then rested. The defense also rested at this time without calling any witnesses.

We are asked to consider a number of issues on this appeal. The defendant has set out a number of propositions in both his original brief and in his brief in support of his amended petition for rehearing, all of which in essence attack the sufficiency of the evidence to sustain the conviction of conspiracy to commit murder. In short, we are asked to rule that as a matter of law, the evidence as presented by the State failed to prove the crime of conspiracy, and as such, the trial court erred in overruling the defendant's motion to dismiss, motion for directed verdict, and demurrer to the evidence.

The crime of conspiracy has generally been defined as an agreement between two or more people to perform an unlawful act, or a lawful act in an unlawful manner. Title 21, Oklahoma Statutes, Section 421 states, in pertinent part, where two or more persons conspire to commit a felony, this conspiracy is in itself a felony punishable by a fine not exceeding One Thousand Dollars or by imprisonment in the State Penitentiary not exceeding two years or by both such fine and imprisonment.

■ The essence of conspiracy therefore, is the unlawful agreement between two or more persons. Although in many jurisdictions this agreement is in itself sufficient to constitute the crime, Oklahoma requires an additional element for the crime of conspiracy. Title 21, Oklahoma Statutes, Section 423 states that:

"No agreement to commit a felony . . . amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement."

Therefore, to constitute the crime of conspiracy in Oklahoma, two essential elements are required: an agreement between two or more people to commit an unlawful act, and some overt act by one or more of the parties in furtherance of this agreement.

The defendant contends in his brief that "at most, this defendant was convicted of something that is not unlawful, that is, a one man conspiracy." With this we disagree. The crime of conspiracy, by its very nature, is a crime clothed in secrecy and is very seldom proved by direct evidence. This Court has held in such cases as *Henderson* v. *State*, Okl.Cr., 385 P.2d 930 (1963) in the Sixteenth Paragraph of the Syllabus that:

"Existence of a conspiracy need not be established by direct evidence, but proof of circumstances from which existence of a conspiracy may fairly be inferred is sufficient."

The defendant argues rather persuasively that no agreement was ever reached between the defendant and George Kriz, because there is no evidence which shows George Kriz ever knew what the object of the conspiracy was, and as such could not agree to commit murder. By his own testimony, Mr. Kriz stated he merely introduced the defendant to Don Woodyard, but was never informed as to the nature of the conversation between Don Woodyard and the defendant.

The defendant also contends that there was no agreement between himself and Don Woodyard, in that Don Woodyard merely feigned acquiescence, but at no time possessed the requisite criminal intent to go through with the murders. Mr. Woodyard testified that he notified the police after the defendant's repeated solicitations, and that he, Woodyard, had no intent to commit the murders himself, and could not possibly contact Rocco and Stretch because he had no knowledge of their whereabouts. Nor was Don Woodyard charged as a coconspirator, and though this issue was not argued by the defendant on this appeal, if the State merely proved the conspiracy between the defendant and Don Woodyard, who was not even named as a co-conspirator, the problem of a material variance be-

tween allegations and proof would have arisen.

We agree with these contentions of the defendant, that no agreement was ever reached between the defendant, George Kriz, and Don Woodyard. However, the defendant further argues that "the co-defendant Linda Rae Pearson was dismissed from this case prior to jury trial, and that there is no trial testimony concerning any agreement, intent nor conspiracy on her part." With this we do not agree.

The record reveals that on every single occasion that the defendant went to discuss the murder of his in-laws with Don Woodyard, the defendant's wife, Linda Rae Pearson, was present. In regard to the first meeting, where the defendant paid Don Woodyard $50.00 in earnest money, Mr. Woodyard testified in the following manner:

"MR. MILDFELT:

"Q. Did he tell you where he got the [$50.00] or where he was going to get it before he got it?

"MR. WOODYARD:

"A. He just said, just a minute and I will be back and he walked over to the car.

"MR. MILDFELT:

"Q. Who was in that car?

"MR. WOODYARD:

"A. His wife." (Tr. 28)

On another occasion, the defendant handed Don Woodyard the names and addresses, work habits and car tag numbers of the intended victims. The intended victims were the mother and stepfather of Linda Rae Pearson. It was established at trial that they had testified against her in child custody proceedings earlier that year which resulted in Linda Rae Pearson losing custody of her children by a prior marriage.

During one of the taped conversations between Don Woodyard and the defendant, which was admitted into evidence, Linda Rae Pearson took the receiver from her husband, the defendant, and said "Don,

why don't you just come up with the fifty, and we'll forget the whole thing." The defendant would have us believe that this statement is strong evidence indicating abandonment of the conspiracy, and with this we agree. However, from the same statement, it is reasonable to infer that the defendant and Linda Rae Pearson had in fact entered into an agreement to commit murder.

In *Hutchman v. State*, 61 Okl.Cr. 117, 66 P.2d 99 (1937), this Court stated:

"The courts of this country have often held that it is not necessary that a conspiracy be proved by direct testimony, in fact, conspiracies are seldom susceptible to such proof. It is often proved by circumstances. We call attention to the case of *Mathews v. State*, 19 Okl.Cr. 153, 198 P. 112, 117 wherein the court says:

"'A conspiracy, leading up to the commission of the crime charged need not be established by direct evidence, but may and generally must be proved by a number of independent acts, conditions, and circumstances. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful common purpose.

"'It is not necessary to prove that the conspirators came together and actually agreed to pursue their purpose by common means, one performing one part and another another. If one concurs in a conspiracy, no proof of an agreement to concur is necessary to make him guilty . . .'"

See, also, *Henderson v. State*, Okl.Cr., 385 P.2d 930 (1963).

■ We therefore hold that there was competent evidence from which the trier of fact could reasonably conclude that an agreement to commit murder had been entered into between the defendant and Linda Rae Pearson, and that this Court will not interfere with the jury's findings, since

it is the exclusive province of the jury to weigh the evidence and determine the facts. See, *Campbell v. State,* Okl.Cr., 546 P.2d 276 (1976).

Having established that there was competent evidence from which a jury could reasonably conclude an agreement had been entered into between the defendant and Linda Rae Pearson, we now address ourselves to the question of whether there was an overt act in furtherance of the objective of the agreement. The defendant contends in his petition for rehearing, and in his brief in support of his petition, that under 21 O.S.1971, § 423:

". . . there must have been, . . . evidence of an agreement to commit murder and an act must be done in furtherance of the objective of the *agreement to commit murder.*" (Emphasis original)

The defendant urges that the payment of the $50.00 by defendant to Don Woodyard, as well as supplying information concerning the intended victim's work habits, are not overt acts in furtherance of the agreement. Rather, such acts are part and parcel of the agreement itself. We are asked by the defendant "not to strain logic and reason to reach a result which does not flow naturally from the proven facts."

■ We feel that the defendant's argument rests on the erroneous assumption that the agreement to commit murder existed between the defendant and Don Woodyard, and that the payment of the $50.00 and supplying information is of necessity a part of the agreement itself and not an overt act. But we need only point out to the defendant that the evidence supports a finding that the agreement to commit murder existed between the defendant and Linda Rae Pearson. Therefore, the payment of the $50.00 by the defendant, the supplying of names, addresses, work habits and car tag numbers of the intended victims were in fact overt acts in furtherance of the pre-existing agreement to commit murder between the defendant and Linda Rae Pearson. See, *Wright v. State,* Okl.Cr., 535 P.2d 315 (1975).

While unnecessary to the determination of the issues here presented, we make reference to the case of *State v. Mandel,* 78 Ariz. 226, 278 P.2d 413 (1954). That case is, in almost every respect, factually identical to the case at bar. The Arizona court therein held that where the defendant hired anouther party to commit murder, supplied the money, as well as information concerning the intended victims whereabouts, these acts by the defendant were sufficient overt acts to constitute the crime of attempted murder. See also, *State v. Gay,* 4 Wash.App. 834, 486 P.2d 341 (1971). Whether the hiring of a party to commit murder, and supplying a would be murderer with money and information, are sufficient overt acts by the solicitor to constitute attempted murder, we do not now decide, but reserve our answer for a more appropriate case. But in the opinion of this Court, such acts by the defendant in the instant case are sufficient overt acts in furtherance of the object of the conspiracy. Accordingly, we are of the opinion that the State presented sufficient evidence reasonably tending to sustain the allegations charged, and that the trial court properly overruled the defendant's motion to dismiss, motion for a directed verdict, and demurrer to the evidence.

We come now to the defendant's next assignment of error. The defendant contends that the introduction of the taped conversation between the defendant and Don Woodyard was inadmissible and highly prejudicial to the defendant. The defendant cites as authority the case of *Cameron v. State,* Okl.Cr., 365 P.2d 576 (1961), wherein this Court held that where one party to a telephone conversation consents to a recording without the second party's knowledge or consent, such a recording may not be used as evidence against the nonconsenting party. The defendant also

cites 21 O.S.1971, § 1757 which states, in pertinent part:

"Any person who . . . fraudulently or without legal authority connects to any telephone or telegraph line or wire any instrument or other apparatus capable of being used in intercepting messages, communications or conversations, is guilty of a misdemeanor . . ."

The thrust of the *Cameron* decision and its interpretation of 21 O.S.1971, § 1757, seems to be that neither party to a conversation may consent to a recording, if such a recording involves a physical intrusion into the telephone lines. This Court held in *Cameron*, supra, that,

"If the evidence had been obtained by listening in over the receiver of the extension, either [party] could publish the conversation . . . But neither party under our statute can tap the telephone lines, for such would be an unauthorized infringement on the company lines . . ."

"There can be no legal tap of such facility without the consent of the person who orginates the conversation, the one who responds to it, and the telephone company. A legal tap could not be made by any party in any other way."

In *Williams v. State*, Okl.Cr., 507 P.2d 1339 (1973) a manager of a motel received a call from room number 5 on the motel office telephone. After answering the phone, there was no response from the calling party, but the manager heard a "loud disturbance" coming from the room. He then made a tape recording of these sounds, and this tape was admitted into evidence. This Court there held that,

". . . there was no tap on the line or interference with the normal telephone lines . . . The motel manager . . . merely recorded that which he, as the proper party to the telephone line, could hear."

The *Williams* case, supra, went on to say that merely recording a conversation with the consent of one of the parties by placing a device against the side of the telephone is not an "intercept" under our statute and is therefore permissible. The *Cameron* decision, supra, on the other hand, holds that if a party to the conversation consents to a recording, and such recording is effected by the slightest physical interference with the telephone line, such as a small splice in the wires, this constitutes an unlawful "intercept" and is impermissible. The purpose of the wire tap statute, according to *Cameron*, supra, ". . . was designed, among other things, to protect not only the privacy of users and subscribers of telephone service, but the telephone company facilities against intermeddling mischief makers and trespassers."

For reasons which are to become apparent, we no longer adhere to the holding in the *Cameron* decision.

In *Rathbun v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), the United States Supreme Court held:

"The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone . . . either party may record the conversation and publish it."

The *Cameron* decision itself recognized this principle, when it stated, ". . . if the evidence had been obtained by listening in over the receiver of the extension, either [party] could publish the conversation . . ." See, also, *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L. Ed.2d 462 (1963); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

Taken together, these cases establish the principle that one who voluntarily enters into a conversation with another takes the risk that such person may memorize, record, or even transmit the conversation. Therefore, when Don Woodyard gave his consent to record the conversation between himself and the defendant, the conversation was divested of its private character. Consequently, 21 O.S.1971, §

1757 can offer no protection of privacy to a conversation no longer deemed to be private.

The State wire tap law, however, must be read in conjunction with the applicable federal law. We must now determine whether such a tape recording is in violation of Title III of the Omnibus Crime Control & Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. This act by Congress is a comprehensive statute defining on a uniform basis the circumstances and conditions under which the interception of wire and oral communication may be authorized. Although we feel that the act has not preempted the field of electronic surveillance, it has at the very least set minimal standards with which all states must comply. The act clearly states that wherever any wire or oral communication is intercepted, it may not be used as evidence in any trial, hearing, or other proceeding in any court of the United States, any State, or any political subdivision thereof if disclosure would be in violation of the act. See, 18 U.S.C. § 2515.

Title III, however, sets out a number of exceptions to the general provision prohibiting unlawful intercepts. Title 18, United States Code, Section 2511(2)(d) states:

"It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

■ Under the facts and circumstances in the instant case, we do not feel that the recording was made for the purpose of committing any unlawful act. On the contrary, it was made to further the ends of justice, and in aid of legitimate law enforcement. We therefore conclude that Don Woodyard's consent to the taping of the conversation was proper, and such recording did not constitute an "unlawful intercept" as prohibited by the federal act. See *United States v. Riccobene,* 320 F. Supp. 196 (E.D.Pa.1970) affirmed, 451 F. 2d 586 (3rd Cir. 1971); *People v. Patrick,* 46 Mich.App. 678, 208 N.W.2d 604 (1973).

Nor, do we believe that 21 O.S.1971, § 1757 should be interpreted to mean that a telephone recording made through the use of a suction cup device is not an intercept, whereas one made by "splicing wires" is an intercept, and is therefore prohibited. Where there is consent by either one or more of the parties to a telephone conversation, distinctions between the methods employed in the taping of the conversations are inconsequential.

■ We therefore hold that where one person is a party to a telephone conversation, such person has the lawful authority to record, or permit another to record, the contents of the conversation for any legitimate purpose. The laws pertaining to eavesdropping and the recording of telephone communications do not apply where one of the parties to the conversation consents to or directs its overhearing or recording. *People v. Canard,* 257 Cal. App.2d 444, 65 Cal.Rptr. 15 (1967), cert. denied 393 U.S. 912, 89 S.Ct. 231, 21 L. Ed.2d 198. Furthermore, such recordings may be made by any reasonable means, as long as the methods employed do not cause serious injury to the telephone lines or interrupt other telephonic communications so as to necessitate repair by the telephone company. To adhere to the rigid standards set out in *Cameron,* supra, i. e. where the consent of all parties to a conversation is required, including the telephone company, would lead to the anomalous result whereby the right of privacy in the use of the telephone has greater sanctity then the right of privacy in the home. With this we cannot agree, and to the extent that *Cameron v. State,* supra, is inconsistent with this opinion, it is hereby overruled.

Accordingly, the defendant's second assignment of error is without merit.

 Lastly, defendant contends that the court failed to adequately instruct the jury by refusing to give certain instructions and by the giving of others. This assignment of error is also without merit. A careful reading of the instructions given the jury show that taken as a whole, they set forth the law of the State of Oklahoma regarding conspiracy. Defendant's requested instructions are not supported by Oklahoma case law. Further, even if support could be found for defendant's contentions in Oklahoma law, it is not necessary that the court instruct the jury in precisely the language requested by the defendant. It is enough if the court instructs on the general principle of the law of the case. See, *Trowbridge v. State*, Okl.Cr., 502 P.2d 495 (1972), citing with approval *Butler v. United States*, 197 F.2d 561 (10th Cir. 1952).

For all of the above and foregoing reasons, the judgment and sentence appealed from should be, and is hereby, *AFFIRMED*.

BRETT, P. J., and BLISS, J., concur.